[No. 17744.  Department One.  September 14, 1923.]

IRA D. CARDIFF, *Respondent*, v. A. P. JOHNSON *et al.*, *Appellants*, YAKIMA NATIONAL BANK, *Defendant*.[1]

CORPORATIONS (172)—POWERS—SALE OF ASSETS—FRAUD—RIGHTS OF MINORITY STOCKHOLDERS—INJUNCTION.  A corporation which for years has not been a going concern or in successful operation, although solvent, may sell all of its property; and the courts will not set aside such a sale, approved by a three-fourths vote of all the stockholders and by four of the five trustees, when the price obtained was not grossly inadequate and no secret interest or advantage was retained by any one, to the disadvantage of the minority stockholders  (MAIN, C. J., dissents).

Appeal from a judgment of the superior court for Yakima county, Holden, J., entered July 18, 1922, in favor of the plaintiff, in an action for an injunction, tried to the court.  Reversed.

*Voorhees & Canfield,* for appellants Johnson, Roberts, and Hathaway.

*Richards, Fontaine & Gilbert,* for appellant Perham Fruit Company.

*D. V. Morthland* and *Grady, Shumate & Velikanje,* for respondent.

HOLCOMB, J.—The amended complaint of respondent seeks to have a certain contract for a conveyance, executed by the Washington Dehydrated Food Company, a corporation, to the Perham Fruit Company, a corporation, deposited with the defendant Yakima National Bank, a corporation, for delivery to the Perham Fruit Company upon the payment of the balance of $29,500 of the purchase price after the cash payment of $500 by the Perham Fruit Company in accordance with the contract, to be decreed void and of no effect as in fraud of the rights of respondent, and the same re-

[1]Reported in 218 Pac. 269; 222 Pac. 902.

strained and enjoined. Upon the filing of the complaint, a temporary restraining order was issued by the trial court returnable on a certain day, which was afterwards continued in force until the case was tried.

Upon trial the court below granted a permanent injunction against the completion of the transaction, this appeal resulting.

The proposition of law insisted upon by respondent, and the theory upon which the injunctive relief was granted, is that a solvent corporation which is a going concern cannot, against the objection of a single stockholder, sell its entire property or capital assets and thereby denude itself of the means and powers necessary to carry on the purposes for which it was organized.

Respondent and the appellants Johnson, Roberts and Hathaway are brothers-in-law. The evaporating plant had been organized by a corporation known as the Washington Evaporated Food Products Company, in 1917, managed by respondent, which continued in operation until February, 1918. It had then become bankrupt, its liabilities amounting to about $100,000, a receiver was appointed, and its property sold at receiver's sale for $50,000. This included all the plant, equipment, book accounts, finished products and personal property on hand. Respondent then interested his brothers-in-law, appellants here, who furnished money, and respondent bought the property from the receiver and conducted the business for a time under the name of Ira D. Cardiff & Company. The operations of the partnership continued until October, 1918. At that time the corporation known as the Washington Dehydrated Food Company was organized with a capital stock of $100,000, the stock being divided equally, one-fourth thereof being held by each of the

brothers-in-law, including respondent. It appears that the partnership had an apparent profit of $36,000 on hand at the time the corporation was organized. This profit was turned in to the corporation, together with the plant, machinery and real estate. The corporation continued the operations of the 1918 season, and ran the plant during 1919 and the early part of 1920. The 1919 operations were unprofitable, respondent claiming that to have been the result of the turning back onto the market by the government of large quantities of evaporated and dehydrated foods. All that was done in 1920 was to dispose of stock accumulated in the 1919 operations. No evaporating was done, the buildings being used for storage purposes.

In 1921, respondent rented the entire plant and operated it in dehydrating fruits. He paid as rental therefor the sum of $4,000 per year, which seems to have been barely sufficient to pay real and personal taxes and the upkeep of the plant. Respondent claims to have made a profit of a little more than $14,000 during that year for himself. Prior to ceasing operations, the company had become indebted in excess of $100,000, when it shut down and turned the property over to respondent on lease because the business was unprofitable and heavily involved. While there were no incumbrances upon the property, it had been financed by the credit of Johnson, Roberts and Hathaway, who had indorsed the paper of the company. The obligations had been greatly reduced by the collection of the indebtedness due the company and the application of these collections to its debts from time to time, until it amounted to $38,900 principal at the time of the transaction in question, represented by notes indorsed by Johnson, Roberts and Hathaway, held by the Yak-

ima National Bank and by the Union Securities Company. This indebtedness all matured August 4, 1922.

In the spring of 1922, the manager of the Securities Company notified appellant Johnson that this indebtedness would not be further carried, and would have to be paid when due. This notification covered the indebtedness to the Yakima National Bank also, as that bank was controlled by the Securities Company. Appellant Johnson and others unsuccessfully tried to dispose of the property. There were no assets out of which to meet the indebtedness, except the plant in question. Negotiations were brought about by the manager of the Yakima National Bank, between Johnson and the Perham Fruit Company. Through its president and manager, the Perham Fruit Company first offered $27,000 for the entire plant, deducting the equipment of the evaporating plant. Appellant Johnson made a counter proposition to accept $30,000 for the property. Respondent was not then in Yakima, but appellant Johnson assured Perham that he had authority to make the deal. On May 27, 1922, he entered into the contract whereby he agreed to sell the real estate, building, and certain personal property to the fruit company for $30,000, and certain local improvement taxes totaling $453.18. Under the contract, the dehydrating company was to have three weeks within which to remove the machinery, boilers, oil tanks, scales, conveyors, etc., which constituted the evaporating plant.

When respondent returned to Yakima he objected to the sale and tried to induce Perham to withdraw his offer for the purchase, offering him $1,000 if he would do so. This was declined, Perham stating that he had bought the property for use and not for speculation. On June 17, 1922, a meeting of the directors of the dehydrating company was held in Yakima, which is the

principal place of business of the company, at which seventy-five per cent of the stock voted not to ratify the sale. Subsequently, on June 21, 1922, a meeting of the stockholders and of the trustees of the dehydrating company was held in Spokane, without notice, but by the consent of all the stockholders, that being legal and permissible by the by-laws of the company, all of the stockholders and trustees being present. At the stockholders' meeting, 750 shares, or seventy-five per cent of the stock, voted to ratify the sale negotiated by Johnson. At the trustees' meeting, four out of five trustees so voted. Respondent, who was present and consented to the holding of the meetings, voted in the negative both as a stockholder and as a trustee. Pursuant to the action of the stockholders and of the trustees, a deed was prepared, and Johnson went to Yakima to deliver it. Before it was delivered and the money in the bank paid over, this action was brought to enjoin its consummation.

Among other powers of the corporation organized by the respondent, Hathaway, Roberts, and Johnson as incorporators, according to its articles, was:

"To buy and sell, and in any manner to deal in real estate and personal property of all kinds, and all kinds of fruit, berries and vegetables, and all kinds of food and food products, hay and feed; to borrow money either with or without securities, and to make, execute and deliver mortgages, pledges and hypothecations therefore."

The term for which the corporation was organized was fifty years from and after September 23, 1918.

Under the articles of incorporation it cannot be controverted that it was *intra vires* the corporate powers to sell the real estate belonging to the company, unless the sale was made in fraud of the rights of any of the

stockholders. *Logie v. Mother Lode Copper Mines Co.,* 106 Wash. 208, 179 Pac. 835.

Respondent claims that the sale was made in fraud of his rights because made for a sum greatly inadequate. He alleged that the value of the property at the time of the sale was not less than $75,000, and testified that it was worth approximately $125,000. This last valuation has no support except that of an appraisal company which made a general appraisement of the plant and equipment, exclusive of the real estate, in October, 1921. Experts in the line of business engaged in by the company, and experts in machinery and plants such as used by it, and experts in real estate values in the vicinity of the property in question, gave no such valuation for the property.

Appellants therefore contend that, since the sale was *intra vires* the corporate powers and was not, under a preponderance of the evidence, grossly disproportionate to its real value, and the company was heavily in debt and had no other property with which to liquidate its indebtedness, the action of the majority of the stockholders and trustees in disposing of the property and assets of the company should be sustained, and that the court is without power to nullify and restrain it.

Appellants admit that, under the common law, and in the absence of statutory enactment for conferring greater power on the majority, neither the trustees nor a majority of the stockholders could sell out the assets of a sound, going corporation against the protest of any stockholder. Appellants contend, however, that it has long been established that, if a corporation is not doing a successful business, or if it is in debt and it is necessary to raise funds with which to pay its obligations, then a majority of the stockholders, or

even the board of directors, may make a valid sale of all of the property and assets to raise money to pay its indebtedness, despite any protest on the part of the minority stockholders.

Respondent asserts that the general rule in this country is one which forbids the sale of the major portion of the capital assets of a corporation by a majority of its stockholders, developed from the leading case of *Abbott v. American Hard Rubber Co.*, 33 Barb. (N. Y.) 578. It is insisted that this state has approved and .followed the principle set forth in the cited case in *Parsons v. Tacoma Smelting & Refining Co.*, 25 Wash. 492, 65 Pac. 765, and *Theis v. Spokane Falls Gas Light Co.*, 34 Wash. 23, 74 Pac. 1004.

In the *Theis* case, *supra,* this court quoted from Cook on Corporations (5th ed.), vol. 2, § 670, p. 1550, as . follows:

"*Neither the directors nor a majority of the stockholders have power to sell all the corporate property as against the dissent of a single stockholder unless the corporation is in a failing condition.* Ever since the case of *Abbott v. American Hard Rubber Co.* the law has been clearly established in this country that a dissenting stockholder may prevent the sale of all the corporate property by the directors or by a majority of the stockholders where the corporation is a solvent, going concern."

. The remainder of the quotation will not be given for the reason that this case is distinguished from the cases referred to in Cook on Corporations by the fact that such decisions were made in cases where the corporation was a solvent, going concern.

Here the concern appeared not to be a going concern, and had not been for about two years. While it was solvent in the sense that its current obligations had been paid off, and it apparently had enough prop-

erty to pay off its remaining indebtedness, yet its credit was largely sustained by the indorsement of the indebtedness owing by it, by appellants. The outstanding fact is that it was not a going concern. It had been unsuccessful from shortly after the time it was organized until the time of the sale.

In the *Theis* case, *supra,* a majority of the stockholders were attempting to transfer the property and assets from one corporation to another, which they organized for the purpose of taking over the control of the older corporation for the purpose of freezing out the minority stockholders. In the *Parsons* case, *supra,* the majority of the stockholders organized a new company and undertook to make a lease of all of the property of the old company to the new one. The majority of the stock in the old company had been transferred to the new. Mr. Rust controlled a majority of the stock in both companies and was a trustee in both. The articles of incorporation of the old company did not give its officers or stockholders any power or authority to lease its property. The statute then in force did not give one corporation power to hold stock in another. The old company was a solvent, going concern. Its capital stock was still largely unpaid. There were thus many elements underlying the decision in that case not present in this case. We should always adhere to the principle that the property and assets of a going, solvent corporation could not be disposed of by a majority of the stockholders over the protest of a single stockholder, in order to get rid of the dissenting stockholder.

We have always held that courts should not interfere merely to settle disputes between stockholders, or substitute their judgment for that of the majority of the trustees of the corporation. *Bergman Clay*

*Mfg. Co. v. Bergman,* 73 Wash. 144, 131 Pac. 485; *Kahan v. Alaska Junk Co.,* 111 Wash. 39, 189 Pac. 262, 10 A. L. R. 151.

In a decision written by Judge Peckham, in *Gamble v. Queens County Water Co.,* 9 L. R. A. 527, it was held:

"To warrant the interposition of the court in favor of the minority shareholders in a corporation or joint-stock association, as against the contemplated action of the majority, where such action is within the corporate powers, a case must be made out which plainly shows that such action is so far opposed to the true interests of the corporation itself as to lead to the clear inference that no one thus acting could have been influenced by an honest desire to secure such interest, but that he must have acted with an intent to subserve some outside purpose regardless of the consequences to the company and in a manner inconsistent with its interests."

In the case at bar, appellants Johnson, Roberts and Hathaway had no interest whatever in the concern which was purchasing the property. They retained no interest in the property sold. They were therefore serving no outside interest, regardless of the consequences to the company.

The general rule is that, if the sale is not *ultra vires* or illegal, and not fraudulent, if made by a majority of the stockholders and trustees, it should be sustained. *Logie v. Mother Lode Copper Mines Co., supra.*

In *Price v. Holcomb,* 89 Iowa 123, 56 N. W. 407, it was held that, where the works of a manufacturing corporation have been operated at a loss from the beginning, and have been idle for about a year, and the corporation, though solvent, is without necessary working capital and unable to secure it, and no tangible plan for operating the works is suggested, the ma-

jority of the stockholders may sell the entire property and business of the corporation, even against the protest of the minority.

It is also held in *Hancock v. Holbrook,* 9 Fed. 353, that the conveyance of the entire property of a corporation in payment of its sole debt, executed under the authority of the board of directors, and ratified by a meeting of the stockholders, without any fraud, when it would have been utter ruin to continue the business of the corporation, is valid and binding as against a dissenting stockholder.

This court also acted upon the same principle in *Pitcher v. Lone Pine-Surprise Consol. Min. Co.,* 39 Wash. 608, 81 Pac. 1047, where we held that, where a corporation is deeply in debt and cannot pay its debts except by disposing of its property, its trustees, acting in good faith, with the approval of a majority of the stockholders, may, notwithstanding the dissent of a minority, sell the corporate property to a newly organized company having assessable stock by exchange *pro rata* for stock of the selling corporation. See, also, *Maben v. Gulf Coke & Coal Co.,* 173 Ala. 259, 55 South. 607, 35 L. R. A. (N. S.) 396; see notes to *Post v. Buck's Stove & Range Co.,* 200 Fed. 918; notes to *First National Bank v. Gustin-Minerva Consol. Min. Co.,* 6 L. R. A. 676.

We do not think that a sale of corporate property for a grossly inadequate price, by a majority of the stockholders or by a majority of the trustees, where any secret interest or advantage was retained or obtained by them to the disadvantage of the minority stockholders, should ever be permitted over the protest of the minority stockholders. Nor do we think that a sale of all or the principal part of the capital assets of a manufacturing or trading corporation, without the

consent and against the protest of a minority stockholder and in disregard of his rights, to the majority stockholders themselves, should ever be sustained.

We do not consider this to be any such case. The other three directors and stockholders of seventy-five per cent of the stock of this corporation believed that the sale was made for the best interests of the company and was in every way advisable.

We consider that the trial court was in error in holding the sale void and enjoining its consummation.

The decree is reversed.

MACKINTOSH, MITCHELL, and BRIDGES, JJ., concur. MAIN, C. J., dissents.

## ON REHEARING.

[*En Banc.* February 18, 1924.]

PER CURIAM.—Upon a rehearing *En Banc,* a majority of the judges are of the opinion that the cause was correctly disposed of by the Departmental decision heretofore filed herein, and the decree of the trial court is therefore reversed.