[No. 24270.  Department One.  April 18, 1933.]

O. C. MOORE, *Appellant,* v. LOS LUGOS GOLD MINES *et al., Respondents.*[1]

[1]Reported in 21 P. (2d) 253.

*O. C. Moore (O. B. Rupp, on oral argument to this court)*, for appellant.

*Alex M. Winston* and *Randall & Danskin*, for respondents.

MILLARD, J.—On behalf of himself and all others similarly situated, O. C. Moore, a stockholder of the Los Lugos Gold Mines, a domestic corporation, hereinafter styled the "old company," brought this action to compel restoration to the old company of its assets alleged to have been transferred, illegally and without consideration, by the old company's officers to the Los Lugos Consolidated Gold Mines, a domestic corporation, hereinafter designated the "new company."

The trial court was of the view that the stockholders of the old company, whose shares of stock were nonassessable, had the legal right, despite the objection of minority stockholders, to amend the articles of incorporation and thereby make the stock assessable; that the transfer by the old company of all of its assets to the new company, whose shares of stock

were assessable, "upon the agreement by the latter to pay all indebtedness of the old company and to exchange its stock share for share with the stockholders of the old company," was, in effect, such an amendment of the articles of incorporation of the old company; that, if the articles of incorporation may not be so amended for such purpose, the transfer was valid, in view of the result thereby achieved. Judgment of dismissal was entered. Plaintiff has appealed.

The old company, a domestic corporation, had a fully paid capitalization of $1,500,000, divided into 1,500,000 non-assessable shares of the par value of one dollar each. Appellant has been the owner of three thousand shares of the capital stock of the old company since August 14, 1930. Under its articles of incorporation, the old company was authorized to

" . . . buy, sell, lease, deal in and otherwise acquire and dispose of mines, mining claims, mineral and mining grounds, mining and mineral concessions and mineral rights and interest in and to all of same, including foreign and domestic concessions of every kind and nature whether granted by the United States Government or the Government of any foreign nation, state or power; and to use, operate, lease, hold and otherwise exercise all rights in connection therewith, including the right to mortgage, bond, encumber or otherwise hypothecate any and all of said property, property rights, or interest therein, and to likewise so acquire, pledge and otherwise dispose of shares of stock and securities of every kind and nature, and that in the carrying out of any or all of the above objects and purposes the said corporation shall have full power to acquire all necessary grounds, buildings, rights of way, smelting, reduction and refining plants and to do all other things usual and common in connection with any and all of said premises, and all of which said purposes and objects shall be exercised in the broadest sense, both within and without the United States, the intent being that any and all of such rights may be exercised at any and all places whatsoever."

Article VI of the articles of incorporation of the old company provided that the seven trustees of the old company "shall manage the concerns of this corporation."

The old company and the new company were not domesticated, or capable of being domesticated, in the republic of Mexico, hence neither could own or hold title to mining properties, concessions or rights, or own or hold any lease or license on or for the operation of mines or mining properties in the republic of Mexico. The old company owned practically all of the capital stock of the Minas de Los Lugos, S. A., a Mexican corporation which owned certain valuable mining concessions and properties in the state of Zacatecas, republic of Mexico.

In the latter part of 1930, the old company, through its ownership of the stock in the Mexican corporation, was in financial distress. The old company was unable to obtain the funds necessary to pay taxes on the Mexican property and other debts, among which were claims of the laborers working in the mines. Sam J. Wilson, president of the old company, purchased labor and other claims against the Mexican corporation in the amount of six thousand dollars.

Wilson submitted a proposal to the old company that it transfer to him all of its assets, which he would use in the organization of a new company under the laws of the state of Washington; that to the new company would be transferred all of the assets of the old company, the new company to pay all the debts of the old company; and to pay a bonus of four thousand dollars to Wilson (that is, pay ten thousand dollars to Wilson), in addition to interest, for the six thousand dollars labor and supply obligations of the old company for which Wilson held assignments. The new company was to be capitalized at $250,000, divided

into 1,000,000 shares of the par value of twenty-five cents each, assessable to the full extent of their par value. Those shares were to be exchanged for shares of stock of the old company when the shareholders of the old company paid to the new company a transfer fee of two cents on each share exchanged.

The proposition was accepted by the trustees of the old company, as shown by the following minutes of adjourned special meeting of the trustees:

"Pursuant to adjournment of the special meeting of the Trustees of this company duly called according to the by-laws of the company, to be held on Saturday, January 24, 1931, at two o'clock p. m., said meeting being adjourned until ten o'clock a. m., Tuesday, January 27, 1931, there were present the following Trustees: William S. Norman, F. Cushing Moore, Sam J. Wilson, A. H. Featherstone and W. J. Porter. Mr. Norman as Vice-President acted as Chairman of the meeting. The affairs of the company were discussed and Mr. Wilson made a proposal to the company as follows: that the company should transfer to him all of its assets to be exclusively used by him in the organization of a new company under the laws of the state of Washington, the said new company to assume all the debts and obligations of this company and to purchase from Mr. Wilson $6,000 of obligations of this company, for which Mr. Wilson holds assignments, for the sum of $10,000, said new company to have a capital stock of $250,000 divided into one million (1,000,000) shares of the par value of 25c per share, the same to be assessable to the full extent of its par value, but at the rate of not to exceed two cents (2c) per share on any single assessment and no assessment to be levied until and unless all previous assessments have been paid or the stock upon which said assessments in said new company are levied, have been sold and that all stockholders in this company to have the right within 60 days from the date of the organization of the new company and from the date of giving the stockholders in this company notice of the organization of the new company, to surrender

their stock in this company and to pay the sum of $20 per thousand shares to the new company for all stock so surrendered and receive stock in the new company in the amount of the stock surrendered by the stockholders of this company, said new company to have three trustees and to assume the debts of this company; the expenses of the incorporation of the new company to be borne by Mr. Wilson who may make a charge therefor against the new company. It was moved, seconded and carried by a vote of all the trustees present except Mr. Wilson not voting, that said proposition be accepted and that the Vice-President and Secretary be authorized to execute the necessary instruments to carry this resolution into effect. It was then moved, seconded and carried by the vote of all the trustees present, except Mr. Wilson not voting, that the Vice-President and Secretary of this company be authorized to write a letter to the Secretary of State of the State of Washington, consenting in the name of this company, to the filing of the Articles of Incorporation of the new company in the name of 'Los Lugos Consolidated Gold Mines.' Mr. Wilson then explained to the trustees present that the result of the resolution as passed would be as follows: if the total debts of this company at the time of the transfer of its assets, consisted of the following items —Debts of this company assigned to Mr. Wilson, $6,000. Same to be assumed by the new company in the sum of $10,000. Other debts,—say,—$4,000. Expenses of incorporating new company including filing and license fees, revenue stamps, books, certificate books, attorney's fees, etc. $1,000. Total $15,000. The new company therefore, at the time of its organization would own the property of this company, but would be in debt $15,000. Mr. Wilson further stated that as stock of this company is turned into the new company and $20 per thousand remitted with it, this money would be available to pay any of the foregoing described debts of this company and the $20 per thousand paid would be credited on the 25c per share par value of the new company, leaving the stock in same assessable to an additional extent of 23c per share. All members of the Board present thereupon agreed,

on motion put and carried, that the foregoing was the understanding of the Board in regard to the proposed transaction.''

Wilson, president of the old company, who dictated and engineered the reorganization and thereby, in violation of his duty as an officer of the old company, realized the inordinate profit of four thousand dollars on an investment of six thousand dollars, on February 23, 1931, wrote the following letter to the board of trustees of the old company, and, in compliance with the demand therein contained, was given a note for ten thousand dollars bearing interest at twelve per cent per annum, on account of the obligations against the old company—obligations for which he had paid six thousand dollars—which note was paid out of the funds realized from the two-cent per share transfer fee exacted of the stockholders of the old company in payment of the privilege of exchanging their stock for stock in the new company:

"Please refer to the purported minutes of your meeting held January 27th, 1931, as prepared by Mr. Winston, and please refer to the meeting of your board held February 16th, at which time a resolution was passed to the effect that interest at the rate of 12% on all sums of monies advanced in payment of debts or organization expenses paid by Mr. Sam J. Wilson or any other shareholder be paid out of the first assessments and that demand notes be executed therefor.

"This letter is to advise you that unless the original proposition as made by me which includes the proposition from me of $6,000 worth of liens for the sum of $10,000 to be likewise evidenced by a demand note bearing interest at the rate of 12% be authorized at your meeting to be held tomorrow that I shall go no further in the matter and that I shall hold myself free to do what I wish to as to the disposal of any liens or claims heretofore purchased by me or which I may hereafter purchase.

"In case the foregoing offer is accepted, the organization of the new company shall be so altered that Miss E. J. Muller shall be a Trustee in lieu of Mr. Sam J. Wilson and that Mr. W. S. Norman shall be a Trustee in lieu of Mr. Wm. J. Porter.

"I wish it further agreed to in case this offer is accepted that Miss Muller may in addition to being a Trustee may act as Secretary and Trustee of the reorganized company. This I say because I am leaving for a trip and while I am not obligating myself or anyone to have it done it is my intention that when I return, Miss Muller will resign as a Trustee and I will be elected Trustee in her stead. It is of course contemplated that upon my being elected as a Trustee that I will also be elected President of the reorganized company.

"If any other director or directors wish to step into my shoes in this matter they are at liberty to do so and I will transfer to them all claims or liens bought by me for the amount paid with legal interest therefor. This proposition is open only until the close of the meeting to be held tomorrow and the money to be paid me tomorrow if this proposition is accepted."

On February 24, 1931, the new company was incorporated under the laws of this state. Two of its three trustees were officers of the old company. At the time of the organization of the new company, the debts of the old company amounted to $17,539.80, of which was the sum of $10,000 payable to Wilson for labor and supply claims of $6,000 against the old company purchased by Wilson.

On March 18, 1931, appellant received a communication from both companies addressed to the stockholders of the old company, and a personal letter from the new company, advising him of the transfer of the assets of the old company to the new company. By those communications, the appellant was informed that failure to exchange his stock in the old company for stock in the new company and pay the transfer fee of

two cents a share within sixty days from date of the letter "will result in the total loss of your investment." The letter of March 18, 1931, addressed to the stockholders, reads as follows:

"A special meeting of the directors of the Los Lugos Gold Mines was held on February 24, 1931, in order to determine the way out of the financial difficulties in which your company had become involved. An imperfect title to the mill, which has a separate title from the mine, together with the failure of the milling plant in its present condition to operate on a sufficiently profitable basis, forced suspension of operations. With this condition existing and the present financial depression making it impossible to market Treasury shares, several thousand dollars in debts accumulated. While we realize alibis are not in order at this time, money is very necessary at once to pay off pressing obligations.

"Under the circumstances, the Board of Directors found the only solution was to transfer the assets of the Los Lugos Gold Mines to a new assessable company, the Los Lugos Consolidated Gold Mines, a Washington corporation, having a capital of $250,000, with one million shares (1,000,000) of the par value of 25c per share. You will note that the new company has only 1,000,000 shares while the old company had 1,500,000 shares. This reduction was made for the reason there are only 884,606 shares of stock outstanding in the old company.

"Enclosed herewith you will find an official notice requesting all stockholders to surrender their stock accompanied by a remittance of 2c on each share so surrendered. This exchange must, according to the sale, be made within 60 days from the date hereof, and your failure to surrender your stock and pay the 2c per share will result in the total loss of your investment. Sufficient funds should be obtained from this first call to pay off the indebtedness and continue the sinking of the shaft on the Progresso vein, which is in exceptionally good ore.

"We are aware of the fact that the assessment privilege is abused by many companies, but you must

appreciate it is the only fair and equitable way for each stockholder to carry his share of the burden. It certainly should be of interest to you, as a stockholder, to know that the directors of the new company own nearly 300,000 shares of stock which they have committed themselves to surrender immediately and pay the 2c per share thereon in order to relieve pressing obligations.

"After you have surrendered your stock in the old company, together with the payment of 2c per share, it is the intention of the new company to levy assessments, and under its articles and by-laws, no one asessment can be levied for more than 2c per share. From the first assessment the new company should obtain sufficient funds to start the work of modernizing the present mill by adding flotation and fine grinding machinery. This will increase the saving of values from approximately 60% to more than 90%. The plans for this work have been designed by a capable metallurgical engineer and the only reason it was not carried out before was lack of sufficient funds. Following the first assessment, a second one will be levied. This should enable the new company to complete the mill alterations. A third assessment may be necessary to meet the payrolls until returns are received from bullion. The large ownership of stock in the hands of the new board of directors is a guarantee of an economical and careful operation. No salary will be paid any director during the time it is necessary to levy assessments to carry the new company into profitable production.

"Fortunately no apologies have to be made for the mine or the mine title. The mill title, which since has proven to be a minor matter, is now being perfected at a small cost. The physical condition of the mine is excellent, the trouble having all been with the milling plant.

"We realize you will not welcome this notice and call for 2c per share for the exchange of stock, and you can readily appreciate that your directors do not, but the company must pay its debts and the mill must be modernized in order to get into profitable production.

"In view of the fact that the directors of the new

580

company have committed themselves to pay their call immediately, an early remittance from all stockholders will be appreciated.''

The personal letter of March 18, 1931, to Mr. Moore reads as follows:

''You are the owner of record of 3,000 shares of stock of the Los Lugos Gold Mines.

''The property of this company has been sold to Los Lugos Consolidated Gold Mines as per circular letter enclosed. This notice is to advise you that you are required, under the terms of said sale, to surrender your stock in Los Lugos Gold Mines to the Los Lugos Consolidated Gold Mines within sixty (60) days from the date hereof, together with a remittance of 2c per share on the stock so surrendered, or a total of $60, if you still hold all the stock standing in your name on the books of the Los Lugos Gold Mines.

''Your stock in Los Lugos Gold Mines, endorsed in blank, should be surrendered to the undersigned Secretary of the Los Lugos Consolidated Gold Mines, accompanied by your remittance, within 60 days from the date of this notice. Upon receipt of said stock and remittance an equal number of shares in Los Lugos Consolidated Gold Mines will be issued and sent to you.''

Under date of April 25, 1931, the following circular letter was sent by the new company to all of the stockholders of the old company, advising them that, unless their stock in the old company was surrendered with a remittance of two cents for each share exchanged as previously directed, the stock in the old company would become valueless:

''This is to announce that since the letter of March 18th, the mine management has been changed. Mr. James B. Cogswell, well known locally in mining circles both as a mine and mill operator in this vicinity as well as in Mexico, is in charge of operations, with William L. Bell of Vancouver, B. C., consulting engineer.

"Reports just received from the mine indicate that we will be able to get our milling plant in operation with considerable less expenditure than the former management estimated. Work is progressing at the mine during the interim and we feel very confident with Mr. Cogswell in charge of operations the financial difficulties will shortly be solved as a result of earnings.

"While there still remains 22 days in which you can surrender your old stock and pay the 2c per share, we urge your immediate remittance in order to speed up the work of reconditioning the mill. Due to many stockholders remitting without surrendering their certificates, we wish to have it clearly understood that you must mail in your certificates, ENDORSED IN BLANK, as well as your remittance of 2c per share before stock can be issued to you in the Los Lugos Consolidated Gold Mines, otherwise your money will have to be returned to you as your stock in our possession is the only means of identifying ownership. In event of your failure to do this on or before May 17th, 1931, you surrender your rights to exchange your old stock and the certificates you now hold will have no value, as all the assets of that company have been sold and transferred in their entirety to this company, the Los Lugos Consolidated Gold Mines. Therefore, your certificate and remittance must be received at this office on or before that date which is the time limit for exchange of stock."

Appellant refused to comply with the demand for surrender of his stock in the old company, and commenced this action. Personal service of the summons and complaint was made May 13, 1931 (less than two months after receipt of the first demand and eighteen days after receipt of the demand of April 25, 1931), on respondent companies. Appellant, at the request of Wilson, president of respondent companies, and on their behalf, with full knowledge on the part of the other officers of the company, granted to respondents

extensions of time within which to appear and defend. The stipulation reads as follows:

"This extension is at the request of defendants and said Wilson, and it is specially understood and agreed that neither the rights of the parties nor the status of said law suit shall be deemed to be in any wise prejudiced thereby or hereby."

Finally, on November 11, 1931, respondents were notified in writing that time for appearance would not be extended beyond November 22, 1931. On November 24, 1931, on motion of appellant, an order of default was entered against respondents, who had made no appearance in the cause. On December 4, 1931, respondents filed motion to vacate the order of default. The motion was based on an affidavit of Wilson reciting the several extensions granted and averring that the notice of November 11, 1931, that time for appearance would not be extended beyond November 22, 1931, was misunderstood. That was the only excuse offered for failure to appear and answer.

Though of the view that "the motion has little merit," the trial court, on January 15, 1932, granted the motion to vacate the order of default. The court said:

"The one thing which appeals to me in this case is the fact that the rights of the owners of approximately 500,000 shares of stock in what is called 'the old company' are involved, since the affidavits disclose that the trustees of the 'new company' own some 300,000 shares of the total of 800,000 odd shares which had been issued. In fact, the action is expressly brought on behalf of the plaintiff and all other stockholders in 'the old company' who may join him. The owners of this half million shares or a goodly number of them may be in sympathy with this action or they all, or a goodly number of them, may be opposed to it. And it is this uncertainty which causes me to hesitate. But for it and for the far-reaching effect of a default judg-

ment, I should have no hesitancy in denying the motion, for I cannot see any good reason advanced for the failure of defendants to make an appearance.''

The cause came on for trial to the court May 12, 1932. It fairly appears that, though considerable expenditures were incurred by authorization of Wilson in the development of the mines in Mexico, no moneys in excess of one thousand dollars were advanced by Wilson except in the later purchase of obligations in the amount of six thousand dollars incurred by his authorization.

The financial distress of the old company was brought about by Wilson. His exaction of a bonus of four thousand dollars for that expenditure in addition to twelve per cent interest and his coercion of the board of trustees of the old company in the matter of reorganization reflect, to state it mildly, an inappreciation of his duty as president of the old company. As further evidence of Wilson's lack of good faith in the management of the affairs of the company of which he was the executive, is his telegram as follows to the American Consul at Guadalajara, Mexico, under date of January 19, 1931:

''To protect my investment Los Lugos Gold Mines it is necessary for me to secure title by the enforcement of liens. Have wired Bell to accept assignments for my account running to such person as he may direct with this in view. Assignments to be deposited with Bank of Montreal in lieu of cash which they will advance. Do not want this money paid unless I can be reasonably certain that by this process I can acquire title to property.''

An interesting item of evidence is the so-called subscription by Miss E. J. Muller, stenographer and private secretary of Wilson, for all of the shares of capital stock, except two, of the new company. She stipulated

as a condition to liability that the $10,000 promissory note, with interest at twelve per cent, should be executed and delivered to Wilson; that within sixty days there should be issued to, and accepted in exchange by, all stockholders in the old company, an equal number of shares in the new company; that each stockholder in the old company should pay, when exchanging his stock, a transfer fee of two cents per share, together with any assessments which may have been theretofore levied on stock of the new company, with interest at six per cent per annum from date of delinquency; and that all stock thereby subscribed in the new company in excess of shares issued in exchange to stockholders in the old company should remain unissued in the treasury of the new company for its corporate purposes. That subscription reads as follows:

"The undersigned hereby subscribes for 999,998 shares of the capital stock of Los Lugos Consolidated Gold Mines, a Washington corporation and agrees to pay therefor, as required by said corporation, the sum of 25c per share and in addition to cause to be assigned to said corporation all of the assets of Los Lugos Gold Mines, a Washington corporation, which said assets consist in substance of the entire capital stock of Minas del Los Lugos S. A., a Mexican corporation, and will likewise surrender and deliver to this corporation claims against the Los Lugos Gold Mines and said Mexican corporation for labor or other running expenses amounting to the sum of $6,000.

"In consideration of this, if this subscription is accepted, this corporation, Los Lugos Consolidated Gold Mines, must execute to Sam J. Wilson its promissory note due on demand in the sum of $10,000 bearing interest at the rate of 12% per annum from date and will also execute its promissory note or notes to said Wilson, likewise payable on demand, bearing interest at 12% per annum from the date thereof, for the amount of any further sums advanced by Mr. Wilson to take up other claims against said Los Lugos Gold Mines and

said Mexican corporation for labor and other running expenses, and for any amounts advanced by the said Wilson for the expenses of organizing this company, Los Lugos Consolidated Gold Mines.

"If this subscription is accepted, it is understood and agreed that the capital stock of this corporation shall be assessable but only in accordance with the articles of incorporation and by-laws of this company to the full extent of 25c per share.

"This subscription is also conditioned upon this company's issuing to all stockholders of Los Lugos Gold Mines, stock in Los Lugos Consolidated Gold Mines on the surrender of certificates of stock in Los Lugos Gold Mines within sixty days from the date of the acceptance of this subscription, or such additional time as the Board of Trustees of the Los Lugos Consolidated Gold Mines shall see fit to grant. Upon the surrender of certificates in Los Lugos Gold Mines, an equal number of shares of stock of Los Lugos Consolidated Gold Mines shall be issued to the persons so surrendering said certificates in Los Lugos Gold Mines.

"This subscription is further conditioned that as to the exchange of stock hereinbefore referred to, each person surrendering stock in the Los Lugos Gold Mines shall pay to this company 2c per share for each share of stock in Los Lugos Gold Mines so surrendered, said payment to be a part of the purchase price of 25c per share, and in case of the granting of an extension by the trustees of Los Lugos Consolidated Gold Mines to any stockholders in Los Lugos Gold Mines before said exchange shall be made, the persons so surrendering stock in Los Lugos Gold Mines shall, in addition to the payment of 2c per share hereinbefore provided for, pay to the Los Lugos Consolidated Gold Mines the amount of any assessments which may have theretofore been levied on the capital stock of the Los Lugos Consolidated Gold Mines on stock theretofore surrendered to it by the stock in Los Lugos Gold Mines, together with interest on the amount of such assessment or assessments at the rate of 6% per annum from the date on which said assessment or assessments became delinquent.

"If this subscription is accepted, the said stock hereby subscribed for shall be issued to stockholders of the Los Lugos Gold Mines if, as and when they surrender their stock in said company and receive stock in Los Lugos Consolidated Gold Mines and the remainder of stock subscribed for shall remain unissued in the treasury of Los Lugos Consolidated Gold Mines to be used for its corporate purposes.

"Dated this 3rd day of March, 1931.

(Signed) E. J. Muller."

All charges of fraud and irregularity on the part of Wilson were dismissed by the trial court, which stated that "at the time of this trial he was not the owner of any stock whatever." Holding, in effect, that the means employed were justified by the end accomplished, the action was dismissed as above recited.

■ When a corporation certifies that the shares represented by a certificate are "non-assessable," that provision becomes a part of the contract between the corporation and the stockholder. The corporation is powerless to levy an assessment on those shares in violation of the contract. The assessment of fully paid shares of stock of a corporation, other than corporations organized for banking or insurance purposes, for the payment of debts of the corporation, is inhibited by Article XII, § 4, of the constitution of the state of Washington. That provision reads as follows:

"Each stockholder in all incorporated companies, except corporations organized for banking or insurance purposes, shall be liable for the debts of the corporation to the amount of his unpaid stock, and no more."

Addressing ourselves to that provision of our constitution, we said in *Meikle v. Wenatchee North Central Fruit Distributors,* 129 Wash. 619, 225 Pac. 819:

"Now, it is elementary law that a subscription contract for shares of stock in an ordinary corporation renders the subscriber liable to pay to the corporation the amount of his subscription and nothing more, in the absence of statutory or constitutional provisions especially imposing upon him a greater liability flowing from such subscription. Our constitutional provision in § 4, Art. XII, . . . is nothing more than declaratory of the substantive common law, excepting as it relates to stockholders in the excepted corporations."

The vested non-assessable property rights of the non-consenting stockholders of the non-assessable shares of stock of the old company were disregarded by the trustees of the old company. The steps taken by the trustees of the old company to effect reorganization and thereby render the non-assessable shares of stock assessable were in violation of law, hence the new company never had a valid existence. The trustees of the old and the new companies were powerless to assess the non-assessable shares of stock of the stockholders of the old company. In fact, a statute authorizing assessments to be made on that stock would be invalid.

"It may be laid down as a rule that a statute authorizing assessments to be made on existing full paid stock is unconstitutional and void as to existing stockholders. This is on the theory that the existing laws become a part of the stockholder's contract of subscription, and that this contract can not be impaired by any subsequent legislation. Paid up stock is the personal property of each individual owner, and the contract by which he acquired such stock embodies the articles of incorporation and the pertinent laws of the state, and a legislature can not change these accrued, contractual, and property rights so as to allow an assessment against such paid up stock, and its forfeiture or sale on non-payment." Thompson on Corporations (3d ed.), § 4826.

See, also, *Whicher v. Delaware Mines Corporation,* 15 P. (2d) (Ida.) 610; *Enterprise Ditch Co. v. Moffitt,*

58 Neb. 642, 79 N. W. 560, 76 Am. St. 122, 45 L. R. A. 647; *Schueth v. Farmers' Union M. & G. Co.,* 116 Neb. 14, 215 N. W. 458.

True, the corporate powers of a corporation shall be exercised by a board of trustees.

"The corporate powers of a corporation shall be exercised by a board of not less than two trustees, who shall be stockholders in the company, . . ." Rem. Rev. Stat., § 3812.

However, the authority vested in the board of trustees extends not beyond the management of ordinary corporate affairs. The corporation not possessing the power to assess its "non-assessable" shares of stock, it follows that the board of trustees does not possess that power.

■■ Nor may a corporation be dissolved or reorganized other than in the manner prescribed by the statute.

"A corporation has no inherent power to incorporate or reorganize. Generally a reorganization can be effected only by virtue of statutory authority . . . The right to reincorporate or to reorganize is like the right to incorporate in the first instance, and can only be exercised by virtue of legislative authority." Thompson on Corporations (3d ed.), § 5966.

"But where there has been no judicial sale of the property, a reorganization can be accomplished by the stockholders only upon the consent and agreement of all, unless there is some statutory provision or an agreement by which the stockholders either not consenting or not consulted shall be protected." Thompson on Corporations (3d ed.), § 5988.

The organization of the new company by the trustees of the old company, in the manner described above, constituted a reorganization of the old company. It was a dissolution of the old company without judicial

approval, and was effected in flagrant disregard of statutory requirements.

A corporation may accomplish dissolution of itself by presenting to the superior judge of the county in which the office of the company is located a petition therefor, which must show that, at a meeting of the stockholders, called for that purpose, it was decided by a vote of two-thirds of all the stockholders to disincorporate and dissolve the corporation. Notice of the application shall then be given by the clerk of the date of the hearing thereon. One of the conditions precedent to an order of dissolution is that the court must be satisfied "that all claims against the corporation are discharged." Rem. Rev. Stat., § 3834. The provisions for dissolution of a corporation for failure to pay annual license fee specify that

" . . . the trustees of such corporation shall hold the title to the property of the corporation for the benefit of its stockholders and creditors to be disposed of under appropriate court proceedings." Rem. Rev. Stat., § 3846.

Failure to follow the prescribed statutory method renders ineffectual any attempt to dissolve a corporation. In no event can a corporation be dissolved without judicial proceedings. *State ex rel. Preston Mill Co. v. Howell,* 67 Wash. 377, 121 Pac. 861; *Haynes v. Central Business Property Co.,* 140 Wash. 596, 249 Pac. 1057; *Patterson v. Ford,* 167 Wash. 121, 8 P. (2d) 1006. Holding that a corporation could not be legally stripped of its property and abandoned by its officers, we said in *Theis v. Spokane Falls Gas Light Co.,* 34 Wash. 23, 74 Pac. 1004:

"But as we read the record in the case, there was no attempt to dissolve the corporation, and it cannot be said to have been within the contemplation of the contract that a two-thirds majority, or any majority, had a right to juggle with the corporation and the

law. The object of the law is a beneficial one, and is to prevent a small minority from unduly influencing the corporation and preventing its dissolution, under circumstances unfavorable to its existence. . . . A dissolution of a corporation within the contemplation of the law is the death of the corporation. It means a disintegration, a separation, a going out of business . . . It is not enough to say that appellant received all his stock was worth. He embarked in this business, and had a right to stay in the business during the expressed life of the corporation, or until it was dissolved by a fair compliance with the law.''

A pertinent authority is *Whicher v. Delaware Mines Corporation*, 15 P. (2d) (Ida.), 610. In that case, the reorganization was attempted by a majority of the stockholders instead of by mere action of the board of trustees, as in the case at bar. Citing with approval *Theis v. Spokane Falls Gas Light Co.*, 34 Wash. 23, 74 Pac. 1004, the court said:

''The stockholders of the Associated Company were the stockholders of the Delaware Company; the board of directors and the officers were almost identical; the Delaware Company transferred to the Associated Company all of its assets without consideration other than the issuance of Associated stock to Delaware stockholders; the Associated Company assumed and agreed to pay the debts of the Delaware Company and carried on its business; the expense of reorganizing the Associated Company was paid by the Delaware Company or its stockholders. It is apparent that, had the new set-up been carried to completion, the only change which would have been effected was in the corporate name and in the assessability of the stock. Therefore this matter must be disposed of upon the assumption that the transaction was a reorganization of the Delaware Company, and not a sale or transfer in the commonly accepted significance of those terms . . .

''No specific statutory authority for the reorganization of a corporation is contained in the laws of Idaho,

either in the Business Corporation Act of 1929 or elsewhere. The Business Corporation Act does make provision for the merger and consolidation of corporations (Sess. Laws 1929, c. 262, §§ 38-43), which carry some of the attributes of a reorganization. We are concerned here, however, with an attempted voluntary reorganization of the Delaware Company similar to that proposed in *Seymour v. Boise Railroad Company, Ltd., supra,* which can be accomplished, absent statutory authority, only upon the consent and agreement of all the stockholders. . . .

"There can be no question as to the right of stockholders to reorganize their corporation, but this right is subject to this well-defined rule that a part of the stockholders, even a majority, cannot reorganize and deprive nonconsenting stockholders of their property or change their contract rights, without their consent. A stockholder has a vested interest in the corporate property and earnings, represented by his shares of stock, of which he cannot be deprived, in the absence of a delinquency which justifies and authorizes forfeiture. . . .

"In other words, nonassenting stockholders 'may not lawfully be compelled to accept a change of investment made for them by others, or to elect between losing their interests or entering a new company.' *Geddes v. Anaconda Copper Mining Company,* 254 U. S. 590, 41 S. Ct. 209, 212, 65 L. Ed. 425. Other cases to the same effect are: [Citing cases, among which is *Theis v. Spokane Falls Gas Light Company, supra.*]

. . .

"Appellants urge the further contention that the proposed reorganization simply amounted to an effort to change their non-assessable shares in the Delaware Company to assessable shares in the new corporation, and that such a program if carried out would violate their contract rights and deprive them of property in violation of constitutional limitations. This position is also well founded in law.

"It is the settled law of this state that when a corporation organized in the state issues stock certificates as nonassessable, this clause becomes a matter of

agreement and a part of the contract and the corporation itself has no power to levy an assessment thereon in violation of the contract. . . .

"Nor does the fact that the creditors might effect a judicial sale of the property affect their position in the slightest degree. . . .

"Nor can this contract be abrogated through the process of a reorganization by the new entity, any more than it can be abrogated by the original corporation. The nonassenting stockholder cannot be forced into the new corporation at all, nor can he be deprived of his nonassessable stock against his will by any majority in any manner. . . .

"The main argument advanced by respondents in support of the transaction complained of is this: That the company was insolvent and could not pay its debts, and that by reason of this condition and by virtue of authority contained in the articles of incorporation and section 32 of the Business Corporation Act, the directors were empowered to *sell* the assets of the Delaware Company to the Associated Company and accept stock of the latter in payment therefor. . . .

"Conceding that under this authority the directors of the Delaware Company had the right to *sell* the assets of the company (provided that it was unable to meet its liabilities then matured) to another corporation and accept shares of stock in the latter company in payment, the position is not sustained by the present record. In this case there was no sale, but the transaction was merely a reorganization of the Delaware Company, as we have heretofore stated. No consideration passed to the Delaware Company, nor was the transfer of Associated shares to shareholders of the Delaware Company within the purview of the statute above quoted.

"A transfer of corporate property to its reorganized entity is not a sale, within the terms of this charter provision or the statutory enactment. 'But there seems to be neither a sale or an exchange nor other disposition of the mining property, within the meaning of the statute. "To otherwise dispose of" does not signify and include "to give away," within the meaning of the statute. The New York corporation

is formed. It has no property. It possesses nothing but a name. Attempt is made in the name of the Montana Company to convey its property to the New York Company, for which the Montana Company receives nothing in return. It does not exchange its property for other property. There is, in effect, simply a change of corporate habitation. So far as stockholders are concerned, they are perhaps permitted to exchange their shares in the Montana Company for the same kind of property in another state, and the laws of Montana for the laws of New York. The statute does not provide that, by a two-thirds vote, stockholders shall exchange their shares for shares in another corporation, or in the same corporation with changed citizenship. It has no reference to such a scheme. A stockholder, we think, may not be compelled to take, in lieu of his stock in the Montana corporation, an equal number of shares in the New York corporation, or the value of those shares; nor can he be compelled to accept payment for his shares in any other way than that prescribed by the Montana statute on a dissolution of the Montana corporation. The Montana Company conveys all its property, and gets nothing in return. If the trustees attempt to wind up its affairs, under section 489, *supra,* there would be nothing to distribute. The new company promises to issue certain of its shares to each Montana stockholder, but we are unable to see how he can be deprived of his interest in the Montana Company without his consent.' [Citing cases.] The cases cited by respondents' counsel on this point, as well as the text authorities quoted, are concerned with actual sales, and not such a transaction as is complained of here.

. . .

''In disposing of the case we have not considered it necessary to pass upon the charge of actual fraud against Baumgartner and Bailey by appellants. The transactions complained of were illegal and constructively fraudulent, no matter with what intent the actors were animated. *The obvious purpose of these defendants was to change nonassessable stock to assessable stock, and thus force the stockholders against their will to finance the corporation and to pay its*

*debts, the greater portion of which debts were owing to these same persons, who were directors and officers of both companies.* The facts give rise to added suggestions of illegality. Directors and officers of a corporation are bound to a high degree of good faith in discharging their duties. Business Corporation Act, Sess. Laws 1929, c. 262, § 29. The meeting at which the resolution providing for a reorganization was passed was entirely dominated and controlled by Baumgartner and Bailey, and each of them was highly interested in the successful accomplishment of the plan, because they thereby expected to have the obligations due them paid. Since the necessary result of carrying out the plan was to force the nonassenting minority either to lose their interest in the corporate property or to pay their pro rata share of the debts due these officers, against their will and contrary to the obligations of their contract, the impropriety of the proceeding is obvious. In this connection the principles laid down in *Ryan v. Old Veteran Mining Company,* 37 Idaho 625, 218 Pac. 381; *Riley v. Callahan Mining Company,* 28 Idaho 525, 155 Pac. 665; *Morton v. Morton Realty Company,* 41 Idaho 729, 241 Pac. 1014, are controlling. The situation is further aggravated by the fact that the stockholdings of Baumgartner and Bailey were greatly reduced in the new company, thereby adding to the proportionate liability of the minority stockholders.'' (Italics ours.)

The foregoing authority and the case at bar are not distinguishable in principle. That, by a purported sale as in the case at bar, a reorganization of a corporation may not be legally effected, was held in *Garrett v. Reid-Cashion Land & Cattle Co.,* 34 Ariz. 245, 270 Pac. 1044. The court said:

''It must be apparent that there is a wide difference between the dissolution of a corporation and the continuing of its business under a different organization, and it must also be apparent that the law providing for dissolution does not authorize a reorganization of it by consolidation or merger under a different name.
. . .

"There is quite a difference between selling all the assets of a corporation for cash and exchanging all its assets for stock of another corporation, as was done here. In one case the implied agreement between the stockholders and the corporation to carry on the business for the period specified in the articles is violated, yet the nonconsenting stockholder will receive his proportionate share of the assets in cash; whereas in the other the contract to carry on the business as long as it is successful and paying is breached, and at the same time the nonconsenting stockholder is forced to invest his money in a corporation under a different name, management, capitalization, and business. If the law at the time one becomes a stockholder in a corporation does not invest the majority of the stockholders with the power to sell the entire assets of the corporation, or to exchange its assets for stock in another corporation, and its articles of incorporation do not give such authority, the exercise of it by a majority of the stockholders against a nonconsenting stockholder cannot legally be done."

Whether the trustees of the old company acted in good or bad faith is beside the question, and the difficulty that must be met in the final adjustment of rights, because some of the stockholders consented to the transfer of shares of stock, is no defense to the action brought by appellant, a nonconsenting stockholder.

"A corporation cannot cease to exist of its own will. Its life continues until either the charter period has expired or the court has decreed a dissolution. The law made it and the law only can put an end to it. As it cannot take its own life directly, it cannot do so indirectly, for that would be a fraud upon the law and against public policy. By the transaction complained of the defendant company was stripped of all its property, and thus prevented from going on in business and deprived of all means of carrying into effect the object of its existence. . . . Whether the process by which it was sought to convert the New York corporation into a California corporation is called reorganization, consolidation, or amalgamation, it was

the exercise of a power not delegated and was void. It was corporate burial in New York for resurrection in California. While the stockholders who consented may be estopped by their acts, those who did not consent can take advantage of this violation of their rights, and the state of New York can demand that those who did the wrong shall make restitution. . . .

"Stockholders of the old association could not thus, against their will, be forced into relations with the new company. . . .

"All the authorities in this state are uniform in holding that the trustees of a corporation cannot so dispose of its property as to virtually end its existence. . . .

"The fact that the trustees acted in good faith did not empower them to do an illegal act; and the fact that there may be some difficulty in the final adjustment of rights, because some of the stockholders consented, while others did not, constitutes no defense to the action." *People v. Ballard,* 134 N. Y. 269, 294, 32 N. E. 54, 17 L. R. A. 737.

As said in *Schwab v. Potter Co.,* 194 N. Y. 409, 87 N. E. 670,

"The law permits no such anomaly as one corporation organized by another corporation, which furnishes all its capital, takes all its shares of stock and holds them for sale. The new organization could never have a valid existence, for the disposition of the shares by the old corporation would not validate an illegal charter. . . Whatever is done by a corporation without authority is done in violation of law, for all action, not authorized directly or indirectly, is prohibited. . . . Ratification may confirm a voidable act, but not one utterly void."

See, also, *Godley v. Crandall & Godley Co.,* 212 N. Y. 121, 105 N. E. 818, L. R. A. 1915D, 632, 643. In that case, as in the case at bar, the assets of the old company were transferred without compensation to a new company. The court said:

"Being unable to secure the consent of a two-thirds majority of the stockholders to dissolve the corporation, the defendants accomplished their purpose by reducing the capital to $15,000 and by turning over the business and good will without compensation to a new corporation. Directors may not thus as against dissenting stockholders in effect terminate the existence of a corporation."

*Pitcher v. Lone Pine-Surprise Consolidated Mining Co.,* 39 Wash. 608, 81 Pac. 1047, cited by respondents in support of their position, and upon which the trial court relied, is not in point. All that was held in that case was that one who, after a corporate sale of property, purchased, for not more than twenty-five dollars, shares of stock of the corporation making the sale, would not be permitted to maintain an action to set aside that sale. We said:

"It is urged by respondents that appellant has no standing that permits him to question the sale of this property. He was not a stockholder at the time of the transactions complained of. He bought the stock he now has for the evident purpose of bringing this action. Care was exercised by him to acquire stock that was not voted at the stockholders' meeting where the action of the trustees, in making the sale, was ratified. He appears to have invested but a very few dollars. Some courts have held that an action of this character cannot be maintained where the complainant was not a stockholder at the time of the transactions complained of. As a rule, we think this correct, although there are doubtless some exceptions. We do not think anything is shown in this record bringing the case within any exception. When a man deliberately 'buys a lawsuit,' he is evidently intending, or looking for, trouble; and the burden is on him to show that his conduct is justifiable. 'He who comes into equity must do so with clean hands.' "

No such situation is presented in the case at bar. Appellant paid $1,050 for his shares of stock

many months prior to the attempted reorganization. The appellant's good-faith ownership of stock of the old company is not open to question. He has the same right as the largest stockholder to insist that the assets of the corporation shall not be diverted from the objects for which it was created. The maxim "de minimis non curat lex" does not apply. Fletcher's Encyc. Corp., § 4077, p. 6967. Appellant's standing in this court in a representative capacity is amply sustained by the authorities.

"Where the right to sue exists, it may be exercised by a single stockholder, or by any number of stockholders, or by a minority stockholder, or by the holder of a single share, provided he sues on behalf of other stockholders similarly situated." 14 C. J. p. 937, § 1455.

"In a suit by a stockholder on behalf of the corporation the real controversy is between the corporation and the person whose acts are complained of; the corporation is the beneficial plaintiff, even though it is joined as a party defendant. The suit is for the benefit of the corporation and all the stockholders and not for plaintiff individually. It must be brought in equity; an action at law cannot be maintained." 14 C. J. p. 938, § 1457.

In *Lange v. Reservation Mining & Smelting Co.,* 48 Wash. 167, 93 Pac. 208, we held that a mining corporation, organized for the purpose of buying, selling and dealing in mines, was authorized to sell for a cash consideration of fifty thousand dollars all its mining properties. In that case, the consideration was paid directly to the corporation, and there was no charge of fraud or unfair advantage.

In *Logie v. Mother Lode Copper Mines Co.,* 106 Wash. 208, 179 Pac. 835, the mining company was authorized by its articles of incorporation to purchase and acquire real and personal property, and sell and alienate the same. We held that, under the statute

(Rem. Code, § 3684) authorizing a corporation to acquire, by purchase or otherwise, and to own, hold, sell and transfer shares of stock of any other corporation, the corporation might sell all, or substantially all, of its corporate property and lawfully receive, in consideration therefor, stock in another corporation. The adequacy of the consideration was not questioned. No constitutional question was raised. We said:

"There being an absence of any allegation, claim, or proof that the officers of defendant corporation were acting otherwise than in good faith, and no charge or claim that the officers were attempting to obtain any personal advantage peculiar to themselves, nor evidence of illegality or inadequacy of consideration for the sale, it results that the judgment of the officers of the corporation, ratified by about ninety-eight per cent of its stockholders, as to the wisdom of the exchange, will not be reviewed."

In the light most favorable to the respondents, the case holds no more than that, where a corporation is unable to obtain funds with which to operate, the board of trustees, with the approval of a large majority of the stockholders, may sell the entire property and business of the corporation, even against the protest of the minority.

In *Cardiff v. Johnson,* 126 Wash. 454, 218 Pac. 269, 222 Pac. 902, we held that, though the trustees could not, nor could a majority of the stockholders, sell out the assets of a sound, going corporation against the protest of any stockholder, if a corporation is not doing a successful business, or if it is in debt and it is necessary to raise funds with which to pay its obligations, then a majority of the stockholders, or even the board of directors, may make a valid sale of all of the property and assets to raise money to pay its indebtedness, despite any protest on the part of the minority stockholders.

All of the cases cited, however, presuppose a valid sale for the purpose of paying the indebtedness of the corporation. In the case at bar, there was not a valid sale. There was a transfer of corporate property to the old company's reorganized entity for the purpose of evading the constitutional inhibition against the assessment of fully paid shares of stock. The obvious purpose of Wilson, like that of the defendants in *Whicher v. Delaware Mines Corporation, supra,* was to change nonassessable stock to assessable stock, and thus force the stockholders, against their will, to finance the corporation and to pay its debts, the greater portion of which debts were owing to Wilson, the president and trustee of the old company. The meeting at which the resolution was passed providing for reorganization was dominated by Wilson, the same as a similar meeting in the *Whicher* case was dominated by the defendants.

We again quote the language of the court in *Whicher v. Delaware Mines Corporation, supra,* respecting the conduct of the defendants, who, like Wilson in the case at bar, if not guilty of actual fraud, did that which rendered the transactions illegal and constructively fraudulent:

"The transactions complained of were illegal and constructively fraudulent, no matter with what intent the actors were animated. The obvious purpose of these defendants was to change nonassessable stock to assessable stock, and thus force the stockholders against their will to finance the corporation and to pay its debts, the greater portion of which debts were owing to these same persons, who were directors and officers of both companies. The facts give rise to added suggestions of illegality. Directors and officers of a corporation are bound to a high degree of good faith in discharging their duties. Business Corporation Act, Sess. Laws 1929, c. 262, § 29. The meeting at which the resolution providing for a reorganization was

passed was entirely dominated and controlled by Baumgartner and Bailey, and each of them was highly interested in the successful accomplishment of the plan, because they thereby expected to have the obligations due them paid. Since the necessary result of carrying out the plan was to force the nonassenting minority either to lose their interest in the corporate property or to pay their prorata share of the debts due these officers, against their will and contrary to the obligations of their contract, the impropriety of the proceeding is obvious.''

It may be that language in some of our opinions permits of interpretation favorable to the position of the respondents. If so, those cases are overruled in so far as aught appears therein sustaining or tending to justify transactions like those out of which this action arose.

■ Respondents' contention that appellant was guilty of laches, hence relief is barred, is without merit. Appellant first learned of the attempted transfer of assets on March 18, 1931. Less than two months thereafter the appellant instituted this action. The sixty-day period fixed for the exchange of stock in the old for stock in the new company had not expired. Surely, no action was taken prior to the expiration of that period by the respondents in anticipation of acquiescence by appellant in what had been done. While the two-cent transfer fee had been imposed, no asssessments were attempted to be exacted until after this action was commenced. It does not appear that the new company was induced to take action of any kind in reliance on approval by the appellant of that which had already been accomplished.

Nor does the record disclose that, prior to the institution of this action, the new company functioned in any way; that is, other than that the assets of the old company were transferred to the new company.

The capital stock of the Mexican corporation, the subject matter of this controversy, was transferred to the new company prior to the letter of March 18th to the appellant. That was appellant's first knowledge of the transaction. It must be borne in mind that the stockholders were not taken into the confidence of the trustees, who were dominated by Wilson. The respondents stipulated with appellant, in consideration of extension of time in which to appear in this cause and answer appellant's complaint,

" . . . that in the meantime and during said period no change will be made in the corporate affairs, business or business management of said defendants, or either of them, that will in anywise affect the rights of the plaintiff or the status or legal standing of the above suit . . . and it is specially understood and agreed that neither the rights of the parties nor the status of said law suit shall be deemed to be in anywise prejudiced thereby or hereby."

Clearly, under the facts, the equitable defense of laches is not available to the respondents. The rights of third persons have not intervened. We can not conceive of the respondents expending money or incurring liabilities in reliance on the appellant's apparent acquiescence in what has been done. Appellant promptly instituted suit. By request of the respondents, the time for bringing that cause to trial was delayed. By stipulation of the parties, it was agreed that the rights of the parties would not be prejudiced by the delay—this at the request of the respondents. There is no showing that the new company, in reliance on inaction of appellant, was induced to do anything to its hurt. If the written stipulation above quoted was breached by respondents ("in the meantime and during said period no change will be made in the corporate affairs, business or business management of said defendants, or either of them"), such breach can not af-

ford to respondents a basis for the equitable defense of laches.

The judgment is reversed, and the cause remanded with direction to the superior court to grant appellant's prayer.

BEALS, C. J., and MITCHELL, J., concur.

HOLCOMB, J. (concurring in the result)—Excepting as to the strictures upon the personal good faith of Wilson, who was exonerated in that regard by the able and conscientious trial judge, I concur in the result reached in the majority opinion. It is enough to decide that, under even our own cases, as well as other well reasoned decisions, what was done amounted to legal or constructive fraud, contrary to the vested right of appellant and others similarly situated.