(No. 5590.  Decided August 18, 1905.)

F. B. PITCHER, *Appellant,* v. THE LONE PINE-SURPRISE CONSOLIDATED MINING COMPANY et al., *Respondents.*[1]

CORPORATIONS—STOCKHOLDERS—ACTION TO RESTRAIN SALE AS ULTRA VIRES—PURCHASE OF STOCK FOR PURPOSE OF SUIT—INTEREST OF PLAINTIFF—ACTIONS—EQUITY.  Where a few dollars are invested in the purchase of stock in a corporation, after the sale of all its assets, for the purpose of bringing a suit against the trustees to set aside the sale, which has been ratified by over ninety per cent of the stockholders, the purchaser has no such interest as to enable him to maintain an action in equity.

SAME — SUIT BY MINORITY STOCKHOLDERS — SALE OF ALL ASSETS TO REORGANIZED CORPORATION—ULTRA VIRES—GOOD FAITH OF TRUSTEES —RATIFICATION.  A sale of all the assets of a mining corporation to a reorganized company having the same trustees, for the purpose of

[1]Reported in 81 Pac. 1047.

raising money to pay a mortgage due to three of the trustees, who participated therein, and also for development work, is not *ultra vires* and void as to minority stockholders, where it appears that the corporation was justly indebted to the trustees, that its stock was nonassessable, and the new corporation was organized with assessable stock by the same trustees, and all stockholders were given an opportunity to exchange their stock on equal terms, the assessments to pay the indebtedness and raise money for development work; and where ninety-three per cent of the stockholders made the exchange and the sale was ratified at a stockholders' meeting, everything being done in good faith and for the best interest of the stockholders.

Appeal from a judgment of the superior court for Spokane county, Kennan, J., entered September 30, 1904, upon findings in favor of the defendants, after a trial on the merits before the court without a jury, dismissing an action brought by a stockholder to set aside a corporate sale of mining property. Affirmed.

*W. T. Stoll, C. S. Voorhees, Reese H. Voorhees, and B. B. Adams,* for appellant.

*Post, Avery & Higgins* and *W. J. C. Wakefield,* for respondents.

Root, J.—The Lone Pine-Surprise Consolidated Mining Company, which we shall refer to hereinafter as the Lone Pine company, owed $25,000 to a certain bank. The latter declining to further carry said indebtedness, an arrangement was made by which three of the trustees and stockholders advanced $22,500, and a mortgage was made by the company on their mining claims to a third party, to protect said trustees. Work was done, and additional obligations incurred and partly paid, until, on October 3, 1903, the indebtedness amounted to $28,070.

At this time the trustees made arrangements with the Pearl Consolidated Mining Company, by which the Lone Pine company should sell and transfer to the Pearl company three of its mining claims, and the latter company should pay

off all the former's indebtedness. It was further provided that each stockholder in the Lone Pine company should receive in the Pearl company the same number of shares he had owned in the Lone Pine company. The Lone Pine company was capitalized at 3,500,000 shares, but only 3,126,000 had been issued. The Pearl company had a capitalization of 3,126,000 shares. The stock of the Lone Pine company was nonassessable; that of the Pearl company was assessable to the extent of five cents per share. The plan was to use one-half of this assessment to liquidate the indebtedness, and to employ the balance in developing and working the mining claims. The trustees in the Lone Pine company were Bibbins, Long, Schmitt, Robbins, Creasor, Ryan, and Jeldness. Those in the Pearl company were Bibbins, Long, Ryan, Schmitt, and Robbins. It will be thus seen that all of the trustees in the latter were like officers in the former company.

The mortgage aforesaid was given for the benefit of Robbins, Long, and Ryan, whose names appear in each of the foregoing lists. At the meeting of the Lone Pine company trustees where the resolution to make the sale was passed, there were present only five of the seven trustees, two of these being Robbins and Long. The action of the board of trustees was submitted to the annual meeting of the stockholders, held sometime afterwards. At this meeting, 2,-328,536 shares were represented. Upon a resolution to approve the action of the board of trustees in making the sale and arrangement, hereinbefore set forth, all of this stock was voted in the affirmative, except 11,000 shares, owned by one person. Subsequently the holders of 2,916,-350, out of 3,126,000 shares of the Lone Pine company, exchanged the same for stock in the Pearl company, pursuant to the arrangement mentioned.

Some months after this, appellant purchased 2,000 shares of the Lone Pine stock not represented at the said stockholders' meeting, and, a few days thereafter, commenced

this action. It does not appear that appellant paid more than $25 for said stock. He had not been a stockholder before this time. Prior to the commencement of this action there had been collected by the Pearl company, upon the stock assessments, something over $20,000, to be applied, under the terms of the arrangement, one-half to the payment of debts, the other half to the development of the mining properties. This action is brought to have said sale set aside, to compel the Pearl company to account for minerals extracted, to have title quieted in the Lone Pine company, and for other equitable relief. From an order, judgment, and decree dismissing the action, appeal is taken to this court.

It is urged by appellant that the action of the Lone Pine company, by which the three mining claims were transferred to the new company, was absolutely void. This is claimed upon the ground that it thereby stripped itself of practically all its property, by a transaction in which three of its trustees were the principal beneficiaries; that the deal was made by said trustees with themselves, and that it would be against public policy to uphold it. It is not claimed that the indebtedness was improperly incurred, or in any way illegal or unjust; but it is urged that the pressure brought to bear by the trustees holding the mortgage occasioned the sale and arrangement made. The trial court found that the selling price was adequate, and that the entire transaction was had in good faith. Appellant contends that the adequacy of the consideration, and the *bona fides* of the trustees, can have nothing to do with the question; that there was no authority in law for the transaction, in view of the dual capacity occupied by the three trustees who were beneficiaries of the said mortgage.

We cannot agree with this contention. It is true that, where trustees, as such, enter into a contract, beneficial especially to themselves as individuals, and the matter is made the subject of judicial inquiry, such proceeding will

be closely scrutinized by the courts. The utmost good faith must be enjoined upon those who, as trustees, represent the interests of others. One in such a position of trust and responsibility may not make the rights of those he thus represents subservient to his own personal interests. He cannot be permitted to consummate a transaction detrimental to his company, in order to profit thereby himself. But the mere fact that he would be personally a beneficiary does not estop him, as a trustee, or the board of trustees of which he is a member, from doing such acts as the welfare of the corporation may require, and as good, honest, business judgment would dictate. The selling of these mines was not an act *ultra vires*. The articles of incorporation, among other things, recite: "The purposes for which this corporation is formed are to work, operate, buy, sell, lease, locate, acquire, procure, hold and deal in mines," etc. The trustees, therefore, had the power to sell these mines. If their conduct was tainted with fraud, actual or implied, the sale could be set aside, upon such a showing, by a party properly interested.

It is urged by respondents that appellant has no standing that permits him to question the sale of this property. He was not a stockholder at the time of the transactions complained of. He bought the stock he now has for the evident purpose of bringing this action. Care was exercised by him to acquire stock that was not voted at the stockholders' meeting where the action of the trustees, in making the sale, was ratified. He appears to have invested but a very few dollars. Some courts have held that an action of this character cannot be maintained where the complainant was not a stockholder at the time of the transactions complained of. As a rule, we think this correct, although there are doubtless some exceptions. We do not think anything is shown in this record bringing the case within any exception. When a man deliberately "buys a lawsuit," he is evidently intending, or looking for, trouble;

and the burden is on him to show that his conduct is justifiable. "He who comes into equity must do so with clean hands."

Another maxim which suggests itself here is, "The law does not concern itself with trifles." When a man with only $25 worth of stock in a given corporation commences a proceeding to enjoin the action of those owning over 93 per cent of the entire stock, worth many thousands of dollars, it should be countenanced only upon a very satisfactory showing. Such does not appear in this record. The Lone Pine company was deeply in debt. It could not pay its debts except by disposing of these mines—at least, no other method is suggested. To protect the stockholders, three of the trustees put their shoulders under the burden, and bore it for some time. Common honesty required that the corporation should see that these men were paid. An arrangement was made by which the burden of making this payment should be distributed *pro rata* upon those for whose benefit the obligation had been incurred. This was by selling the property to a newly organized company having assessable stock, which was to be exchanged *pro rata* for the Lone Pine stock. We can see nothing unfair, illegal, or inequitable in this method. It bears the impress of good business sense, impartiality, and fair dealing. That it was so considered by the stockholders, is evidenced by the fact that over ninety-three per cent of the stock was exchanged, according to the plan adopted. No other or better plan appears ever to have been suggested by appellant, or his predecessors in interest, or by any one else. One who buys stock in a corporation does so with the knowledge that its affairs must be dominated by a majority of the stockholders. The action of a majority of the board of trustees, acting legally, must be deemed to be the action of the entire board. And an assumed action of the board, whether legal or not, becomes binding upon the stockholders when they themselves, by a majority vote, ratify it — assuming, of

course, that it be a matter not *ultra vires* or fraudulent. This is true to the extent of disposing of all the property of the corporation, where necessity so requires. The court of appeals of New York in the case of *Kent v. Quicksilver Mining Co.,* 78 N. Y. 159, spoke as follows:

"In the application of the doctrine of *ultra vires,* it is to be borne in mind that it has two phases: one where the public is concerned; one where the question is between the corporate body and the stockholders in it, or between it and its stockholders, and third parties dealing with it and through it with them. When the public is concerned to restrain a corporation within the limit of the power given to it by its charter, an assent by the stockholders to the use of unauthorized power by the corporate body will be of no avail. When it is a question of the right of a stockholder to restrain the corporate body within its express or incidental powers, the stockholder may in many cases be denied, on the ground of his express assent or his intelligent though tacit consent to the corporate action. If there be a departure from statutory direction, which is to be considered merely a breach of trust to be restrained by a stockholder, it is pertinent to consider what has been his conduct in regard thereto. A corporation may do acts which affect the public to its harm, inasmuch as they are *per se* illegal or are *malum prohibitum.* Then no assent of stockholders can validate them. It may do acts not thus illegal, though there is want of power to do them, which affect only the interest of the stockholders. They may be made good by the assent of the stockholders, so that strangers to the stockholders dealing in good faith with the corporation will. be protected in a reliance upon those acts."

The case just quoted from is a very instructive one, having been thoroughly argued and carefully considered. See, also, *Kirwin v. Washington Match Co.,* 37 Wash. 285, 79 Pac. 928. For other authorities bearing upon the questions involved, attention is called to the opinion in the case of *Breeze* against these same respondents, decided at the same time with this.

The record in this case discloses nothing that would justify a court in granting appellant the relief sought.

The judgment of the trial court is affirmed.

CROW, RUDKIN, and FULLERTON, JJ., concur.