[Civil No. 2776. Filed April 23, 1929.]

[276 Pac. 526.]

EZRA W. THAYER, Appellant, v. THE VALLEY BANK, a Corporation, Appellee.

See Corporations, 14 **C. J.**, sec. 1347, p. 884, n. 83; 14a **C. J.**, sec. 2460, p. 540, n. 81, sec. 2461, p. 541, n. 89.

Mr. Maurice Blumenthal, for Appellant.

Messrs. Kibbey, Bennett, Gust, Smith & Lyman, for Appellee.

LOCKWOOD, C. J.—Ezra W. Thayer, hereinafter entitled plaintiff, brought suit against the Valley Bank, a corporation, hereinafter entitled defendant, praying that defendant be declared to be holding the net profits of a sale of certain real estate in trust for plaintiff and others, and for an accounting of said trust. Defendant demurred generally to the amended complaint, which demurrer was by the trial court sustained, and, plaintiff electing to stand upon his com-

plaint, judgment was entered dismissing the action. From the judgment plaintiff has appealed.

There is but one question presented on appeal, and that is whether or not the complaint states a cause of action. The material allegations of the complaint are in substance as follows: In November, 1922, the Central Block Improvement Company, hereinafter called the company, was organized as a corporation under the laws of Arizona. By its articles of incorporation the nature of the business in which it was to engage was set forth as follows:

"Article IV. The general nature of the business proposed to be transacted by said corporation shall be to buy or otherwise acquire real estate, and to subdivide, plat and sell the same, and generally to buy, sell and deal in real and personal property of every kind and description in such manner, and upon such terms as the Board of Directors may determine; to act as trustee and in every kind of fiduciary capacity, and generally to do all things necessary or convenient which are incident to or connected with the general business above mentioned, which a natural person might or could do."

There were 152,070 shares of stock outstanding, plaintiff being the owner of 11,932½ shares, while 92,952½ shares belonged to defendant, but were carried in the name of one R. E. Moore in order that the true ownership of such stock should not be disclosed, a fact of which plaintiff was ignorant. During the latter part of 1922 the company became the owner of the east half of block 92 in Phoenix, Arizona, this being one of the most valuable pieces of unimproved realty in the city of Phoenix. At the first annual stockholders' meeting of the company, held in March, 1923, five directors were chosen, one of whom was an officer in defendant corporation, and said directors continued in office during all the times mentioned in the complaint, no other stockholders' meeting of the company ever being held. In Febru-

ary, 1925, a special meeting of the board of directors of the company was called for the purpose of considering the sale of the real estate above mentioned, all of the directors consenting to the holding of such meeting, and at it defendant made an offer to purchase the property for $175,000. This offer was accepted by the majority of the directors, and the property was duly transferred to defendant. Part of the proceeds of the sale was immediately distributed among the stockholders, including plaintiff, and accepted by them. Defendant held the property until April 29th, 1927, and then resold it at a profit which was alleged to be approximately $190,000.

In June, 1927, the company sent to its stockholders a second check, advising them that it was a final liquidation of all its assets. This check, however, was not cashed by plaintiff, for the reason that he about then, for the first time, discovered that defendant had at all times been the true owner of the stock standing in the name of R. E. Moore. He thereupon protested to defendant at its action in purchasing the property without disclosing its real ownership of the majority stock of the company, and demanded his *pro rata* of the profits of the $190,000 made by the defendant as above set forth.

It is further alleged that at the time the company sold the property it was not insolvent, and there was no necessity of its making the sale; that the price paid was wholly inadequate and was not the fair market value at that time; that by the sale the company was divested of all its assets; that the directors had no authority, either express or implied, to sell the property; and that the sale was never authorized or ratified at any meeting of the stockholders. There is no allegation in the complaint that the directors or any of them were guilty of any actual or intentional fraud in the premises, or that they were dominated

or controlled by defendant, or that the sale did not represent what they honestly believed to be a fair price for the property at the time it was sold, and for the best interests of the company.

There is but one legal question which we need consider in the case: Was the board of directors of the company vested with the power and authority to sell the property to defendant for the price and under the circumstances set up in the complaint? Ordinarily, the board of directors of a corporation has entire charge of the business of the company, and has plenary authority to conduct its business affairs, unless it is otherwise provided in the articles of incorporation or by-laws. It is the rule at common law, however, that the directors of an ordinary business corporation have no power to dispose of all its assets without the consent of all its stockholders. This rule has been modified in Arizona by statute, so that the corporation may dispose of all its assets and wind up its business when authorized by a majority vote of the outstanding stock, unless a different rule is adopted in its articles of incorporation. The reason for this limitation is that the corporation is organized for the purpose of doing business of some nature, and, if so, its shareholders have the right to insist that the corporation continue for the purpose for which it was organized. A sale, therefore, of all its property, or so much thereof as would prevent it from continuing in such business, would constitute a violation of the corporate contract. 7 R. C. L. 574.

To this rule there are two exceptions: (1) If the corporation is a failing one, it may dispose of its assets for the purpose of closing out the business. This exception is based upon the theory that, if the corporation is about to be forced out of business through failure, the directors may close the business out immediately, so as to save what they can from the wreck for the stockholders. (2) If the conversion of

all assets into cash from time to time is in further-
ance of the business for which the corporation is
organized, the transaction is not *ultra vires.* For
instance, if a corporation is organized for the purpose
of buying, selling and dealing in real estate, it would
naturally have the power to sell all the real estate it
owned at a particular time because that is the very
object of its organization. A sale of its tangible
assets under such circumstances furthers rather than
hinders the carrying out of its contract with its stock-
holders. In support of this exception the following
cases have been cited: *Hendren* v. *Neeper,* 279 Mo.
125, 5 A. L. R. 927, 213 S. W. 839; *Sewell* v. *East
Cape May Beach Co.,* 50 N. J. Eq. 717, 25 Atl. 929;
*Shaw* v. *Hollister Land & Imp. Co.,* 166 Cal. 257, 135
Pac. 965; *Logie* v. *Mother Lode Copper M. Co.,* 106
Wash. 208, 179 Pac. 835; *Lange* v. *Reservation M. &
S. Co.,* 48 Wash. 167, 93 Pac. 208.

We think the true rule is well laid down in the
case last cited as follows:

"It is the contention of the appellant that neither
the trustees, nor a majority of the stockholders of a
corporation, have power against the objection of
minority stockholders, to sell or otherwise dispose of
the entire property of the corporation, where no
necessity exists for such action, such as the payment
of legitimate debts, the prevention of further losses
from a losing business, or such like causes. Unques-
tionably this was the rule of the common law as
applied to a corporation organized to carry on a par-
ticular business, when such sale would have the effect
of thwarting the purposes for which it was organized,
and destroying the corporation itself; and especially
was it true where the purposes of the sale were to
'freeze out,' or otherwise deprive the minority stock-
holders from further participation in the profits of
the business conducted by the corporation. *Theis* v.
*Spokane Falls Gas Light Co.,* 34 Wash. 23, 74 Pac.
1004; *Parsons* v. *Tacoma Smelting & Refining Co.,*
25 Wash. 492, 65 Pac. 765.

"But in the case before us the sale does not disrupt the corporation, nor is it contrary to the purposes for which the corporation was formed. On the contrary, the corporation will be in as good a condition to proceed with the objects it was formed to promote, after this sale, as it was before, and the sale will be but fulfilling one of its objects and purposes. Whether the sale is wise or not from a business standpoint of view is not the question. It is a question of power in the board of trustees. And this power exists, we think, both by virtue of the articles of incorporation, and the general law conferring the management and control of the corporate business on the board of trustees. *Pitcher* v. *Lone Pine-Surprise Consol. Min. Co.,* 39 Wash. 608, 81 Pac. 1047.''

It is true in many of these cases a majority of the stockholders finally approved the action of the board of directors, but in most of the states from which the cases were taken a majority vote was not sufficient to authorize the winding up of the corporate affairs, so that necessarily the sales must have been upheld upon the ground that they did not have the effect of dissolving the corporation, and were therefore within the power of the board of directors.

On examining the articles of incorporation of the company it will be seen that one of its principal purposes, if not the only one, was to buy and sell real estate, and it was not even specifically authorized to improve and hold it. It appears to us that it was clearly contemplated that a sale of all the realty owned by the company might be made. Nor would this necessarily cause its dissolution. The assets converted into cash might very properly, under the articles, have been re-invested in other realty to be sold at a profit, and the process thus begun continued indefinitely. It is true the complaint alleges that such action was not taken, but that the assets were divided among the stockholders so that the corporation was in effect dissolved. Plaintiff, however, does not complain of the division of the assets, but of the

sale of the property—a very different thing. It is urged by plaintiff that we have held there are cir-·cumstances where a majority stockholder occupies a fiduciary relation to the minority, and this is true. In the case of *Heffern etc. Min. Co.* v. *Gauthier*, 22 Ariz. 67, 193 Pac. 1021, this court stated:

"There is a prevailing idea with a great many men that majority shareholders of a corporation can con-·duct the business affairs of the corporation as they see fit. That is not so. While in a narrow and restricted sense it cannot be said that the holder of the majority of the stock of the corporation occupies a relation of trust, yet it can be said in a larger and broader sense that he occupies a fiduciary relation to the holders of the minority stock and the corporation, who can only act through him. In the broader sense the holder of the majority of the stock owes to the other stockholders and the corporation the duty to exercise good faith, care, and diligence to conserve the property of the corporation and to protect the interests of the minority stockholders, and any act of his, in dealing with the property of the corporation, in violation of this duty, for his own selfish interests and gain, will not and cannot be recognized. Majority shareholders can no more, for their own benefit and advantage, appropriate the property of the corporation, than the minority shareholders, and; where the act is in itself a violation of the duty that arises from their fiduciary relation, the corporation can rescind that act."

We reaffirm the doctrine laid down in that case. If it were alleged in substance that defendant through its ownership of the majority stock of the company had for its own selfish interest and gain corruptly and fraudulently compelled or induced the directors of the company to make the sale which is questioned, the situation would be very different, but no such allegation appears. For all that the complaint shows, at least four of the members of the board of directors who made the sale might have been minority stockholders, entirely free from any influence whatever on

the part of the defendant, making the sale in an honest belief that the price paid was wholly adequate at the time, and it might be equally true that defendant itself believed in good faith it had paid the full market price of the property at that time, in the speculative hope that at a later date it might appreciate in value. To say that a majority stockholder may not purchase any property from a corporation when the sale is approved by a board of directors not under the influence of that stockholder, and with all parties acting in perfect good faith, without being liable for a division of any speculative profits which might be realized in the future, is extending the doctrine of trusteeship far beyond the rule of the Heffern case, *supra,* or of any other case to which we have been cited.

We are of the opinion that there is nothing in the complaint to show that the sale was not made in strict accord with the rules of both law and equity. Such being the case, it is not necessary that we should consider any of the other questions suggested.

The superior court of Maricopa county correctly sustained the demurrer to the complaint, and its judgment is affirmed.

McALISTER and ROSS, JJ., concur.