[Sac. No. 5389.   In Bank.—Aug. 25, 1941.]

G. W. BRAINARD, as Trustee in Bankruptcy, etc., Appellant, v. PIERRE DE LA MONTANYA et al., Respondents.

Grant H. Wren, Clarence A. Shuey and Arthur L. Shannon for Appellant.

John Ralph Wilson, Bertrand F. Lurie and Nathan F. Coombs for Respondents.

SPENCE, J., *pro tem.*—Plaintiff, as trustee in bankruptcy of Bennett Distilling Company, a corporation, brought this action against defendants Pierre De La Montanya and his wife, seeking to establish an alleged trust and to recover alleged secret profits. The cause was tried by the court sitting without a jury and judgment was entered in favor of the defendants. Plaintiff appeals from said judgment.

The controversy arose out of the business dealings over a period of years of defendant Pierre De La Montanya. In 1920 said defendant, together with E. J. O'Brien and E. A. Groezinger, entered into a copartnership for the purpose of manufacturing and selling non-alcoholic beverages and syrups under the Cresta Blanca label. The parties handled their affairs informally and no articles of copartnership were ever drawn. Each of the parties continued thereafter to engage in independent activities, said defendant dealing as an alcohol broker, Groezinger dealing in whiskey and O'Brien receiving royalties from Rathjen-Eggers. In 1923 said parties organized a corporation known as Cresta Blanca Liquid Sunshine Company for the purpose of carrying on the business formerly

conducted by the copartnership. They received stock' for their interests in the copartnership. Stock to the amount of $7500 was sold for cash but this stock was subsequently purchased by said defendant. Thereafter the outstanding stock was held in approximately the following proportions: De La Montanya 73 per cent, O'Brien 23 per cent and Groezinger 4 per cent. In 1928 the Cresta Blanca Company was organized for the purpose of taking over the Cresta Blanca Liquid Sunshine Company and continuing the business of manufacturing and selling non-alcoholic beverages and syrups under the Cresta Blanca label. The newly formed corporation had the same directors and officers as the old corporation, with the exception of Groezinger. De La Montanya acted as president and O'Brien acted as vice president. The stockholders and their proportionate stock interests remained the same, except that the stock of Groezinger was transferred to and was carried in the name of De La Montanya, with the consent of all concerned. Thereafter there were but two stockholders of record, but Groezinger admittedly owned 4 per cent of the stock and he continued to take an active part in the business. The business affairs of all said corporations were handled very informally, there being practically no formal directors' meetings held and practically no minutes kept at any time. The parties apparently continued to act in much the same manner as partners. All actively participated in the conduct of the business and their decisions were made through informal discussions. The parties also continued to engage in separate activities. The proportionate stock interests remained the same until October, 1935, when De La Montanya sold all of his stock to Edmond F. Maher for $40,000. In 1935 the name of the corporation was changed to Bennett Distilling Company and it continued its business under that name until the corporation was adjudicated a bankrupt in September, 1936. This action was brought against De La Montanya and his wife in July, 1938.

The complaint was in three counts. The first count involved what has been termed the real estate matter; the second count involved the brandy matter; and the third count involved the alcohol matter. Each of said counts was based upon the theory that defendant had dealt personally with or through the corporation to his own advantage without the knowledge or consent of the other directors and stockholders

and in violation of the fiduciary relationship existing between defendant and the corporation. The only allegations of the complaint involving the wife of defendant Pierre De La Montanya are found in the first count. It appears that the real property was purchased in the name of the two defendants and that defendant Pierre De La Montanya thereafter conveyed his interest therein to his wife. We shall hereinafter refer to defendant Pierre De La Montanya as the defendant.

## The Real Estate Matter.

As above indicated, the Cresta Blanca Company was organized during the prohibition era and, for some time, the company dealt solely in non-alcoholic beverages. In April, 1933, Congress legalized the manufacture and sale of wines of 3.2 per cent alcoholic content. In anticipation of this legislation the company had sent its representative, Edmond F. Maher, to Washington to apply for a permit to deal in such wines. Maher wired from Washington that it would be necessary to obtain premises separate from those used for dealing in non-alcoholic beverages in order to obtain a permit to deal in such wines. Defendant sought suitable premises in the vicinity, and on Saturday, April 15, 1933, he signed a contract on behalf of the company to purchase a building at 704 Sansome Street, said building being located directly across the street from the office of the company.

On Monday, April 17, 1933, the real estate agent called at the office of the company, and defendant then told O'Brien and Groezinger that he had arranged for the purchase of said building by the company. O'Brien protested the purchase of any real property by the company and, as a result of the conversation, defendant stated that he would purchase the property himself and rent it to the company for $200 per month. Groezinger said in the presence of O'Brien, "It is all right with me." Thereafter defendant purchased the premises, taking a deed in the name of himself and his wife and executing a note and deed of trust to secure the balance of the purchase price. Thereafter he paid all interest on the note together with the taxes and insurance on the premises. The occupation by the company of the premises at 704 Sansome Street began on April 15, 1933, and continued until late in 1935 or the early part of 1936, and the company paid to defendant the rental of $200 per month during that entire

period with the knowledge and consent of O'Brien and Groezinger.

With respect to said transaction, the trial court found that defendant fully informed the other members of the board of directors of the purchase of said real property on behalf of the corporation; that O'Brien and Groezinger disapproved of any purchase of any real property by the corporation; that it was thereupon agreed by the corporation, acting through its board of directors and with the consent and knowledge of all its stockholders that defendant should personally purchase the property and rent the same to the corporation for a monthly rental of $200; that defendant thereupon assumed the obligation of purchasing said property and the corporation was released from said obligation; that the corporation, acting through its board of directors and with the consent and approval of all the stockholders, took possession of said premises and paid the agreed rental; and that no act of defendant was done secretly or in violation of any fiduciary relationship which may have existed between defendant and the corporation.

### The Brandy Matter.

The brandy referred to in the second count consisted of a large quantity thereof distilled in the early twenties by Sun Maid Raisin Growers Association. In 1928, and again in 1930, defendant personally endeavored to arrange for the sale of said brandy but he was unable to procure the necessary permits for the preparation of the brandy for sale. In the summer of 1932, however, the Sun Maid Raisin Growers Association entered into a contract with defendant for the disposal of said brandy. Twenty-five barrels thereof were donated to the Cresta Blanca Company to be bottled and sold. The purpose of this donation by Sun Maid was to stimulate the interest of the trade with a view to the possible sale of said brandy to some of the large dealers in distilled liquor. This purpose was known to O'Brien and Groezinger. The brandy was accepted by the corporation and was bottled under the Cresta Blanca label. Only a small quantity of said twenty-five barrels was sold by the corporation under the original plan, due to threatened litigation by the owners of the Cresta Blanca trade name.

In December, 1932, defendant met in Los Angeles with a representative of Joseph Finch & Company and a representa-

tive of Sun Maid. A sale was negotiated for all of the Sun Maid brandy together with the remainder of the twenty-five barrels belonging to the Cresta Blanca Company. Defendant and one Roy Payne received a commission from Sun Maid upon said sale. At that time defendant procured from Joseph Finch & Company an option on two hundred barrels of said brandy, which option he later exercised in July, 1933. He also acquired nineteen barrels of brandy directly from Sun Maid. He sold one hundred barrels of the last-mentioned brandy to a dealer in San Francisco and the remainder was marketed by him under his own label. A portion of this brandy was thereafter purchased from defendant by the Cresta Blanca Company.

In this connection, the trial court found that at all times during his affiliation with the Cresta Blanca Company defendant personally and on his own behalf was engaged as a broker in the selling of alcoholic beverages for personal profit, which fact was fully known and approved by all the directors and stockholders of the corporation; that in 1932 the corporation was engaged solely in the manufacture and sale of non-alcoholic beverages and was not authorized or empowered to engage in the manufacture or sale of alcoholic beverages; that said brokerage business of defendant was disconnected from the business of the corporation and was not in competition therewith and did not conflict with his duties as a director of the corporation; that all of the directors and stockholders knew of the donation of the twenty-five barrels of brandy to the corporation and knew and consented to the arrangement of defendant with Sun Maid whereby defendant was to receive a commission on the sale of said brandy; that defendant, acting in his own individual capacity and in conjunction with Roy Payne, negotiated the sale of said brandy to Joseph Finch & Company for a commission, which was shared equally by defendant and Payne; that said transaction was fully disclosed at said time to all of the directors and stockholders of the corporation who consented and approved of defendant's dealing in said transaction; that defendant, in pursuance of his own business of dealing in alcoholic beverages, obtained for his own individual purposes and with his own funds approximately 200 barrels of brandy and, after having fully disclosed to all the directors and stockholders his personal interest in said brandy, sold certain amounts thereof at vari-

ous times to said corporation with the consent and approval of all of said directors and stockholders, which brandy so purchased was disposed of by the corporation at a profit to itself; that said transactions involving sales of defendant's brandy to the corporation appeared on the books of the corporation and payment therefor by the corporation was made by the corporation acting through its officers and directors, other than defendant.

### The Alcohol Matter.

From 1920 until 1936, and at all times during the dealings between the parties, defendant acted independently and in his individual capacity as a broker dealing in alcohol. Defendant's connection with certain alcohol companies and his receipt of brokerage commissions from said companies was known to O'Brien and Groezinger throughout their association with defendant. The corporations with which the parties were connected used alcohol in the manufacture of their products and, on numerous occasions, alcohol was ordered by the employees when needed from the alcohol companies represented by defendant without consulting defendant. Defendant received brokerage commissions from the alcohol companies in said transactions.

In this connection, the trial court found that defendant received said brokerage commissions in pursuance of his individual business as an alcohol broker; that the price paid for said alcohol was the market price and was not enhanced by the payment of said commissions; that defendant fully disclosed to all the directors and stockholders of said corporations his relationship with the alcohol companies and the fact that he was receiving brokerage commissions on all of said alcohol purchased from said companies and that all of the directors and stockholders approved and consented to said transactions; and that said transactions and the receipt of said commissions by defendant were not in conflict with his duties as an officer and director of said corporations.

### Plaintiff's Contentions.

Plaintiff contends on this appeal that the evidence is insufficient to sustain the findings and that the decision is against law, but in our opinion neither of said contentions may be sustained.

Our review of the record leads us to the conclusion that there was ample evidence to sustain all of the material findings. Groezinger had died prior to the trial and the main witnesses were defendant and O'Brien. The evidence given by O'Brien was in conflict in certain particulars with the evidence given by defendant but the trial court resolved those conflicts in favor of defendants. It would serve no useful purpose to review the conflicts in detail. Suffice it to state that O'Brien denied the occurrence of several discussions relating to the transactions involved and his testimony tended to show a lack of full disclosure on the part of defendant and a lack of full knowledge and consent on the part of himself. On the other hand, the conflicting testimony given by defendant, which was corroborated in many important details by the direct testimony of disinterested witnesses and by the surrounding circumstances, showed full disclosure on the part of defendant and full knowledge and consent on the part of all the directors and stockholders, which included only O'Brien and Groezinger in addition to defendant himself. As above indicated, we are of the view that defendant's testimony and other testimony in the record clearly sustain the material findings.

While the briefs are devoted largely to a discussion of the question of the sufficiency of the evidence to sustain the findings, plaintiff apparently takes the position that the decision is against law even assuming the sufficiency of the evidence to sustain said findings including those relating to full disclosure and full knowledge and consent. We cannot agree with plaintiff in the position thus taken. The corporations involved were essentially closed corporations which were merely used as the mediums through which the three men transacted a portion of their business. It appears that the corporations were originally organized solely for the purpose of manufacturing and selling non-alcoholic beverages and syrups and that each of the three men continued to conduct an independent business, dealing in alcohol and alcoholic beverages under the limitations provided by law during the prohibition era. There were no directors or stockholders other than said three men during any of the times in question and we know of no rule which would prevent any one of the three men from dealing with said corporations in his indi-

vidual capacity upon full disclosure and with the full knowledge and consent of the other two men.

Plaintiff cites and relies upon section 311 of the Civil Code but that section does not appear to be helpful to plaintiff under the circumstances. In the first sentence of said section there is set forth in general terms the duty of the directors and officers to act in good faith and with a view to the interests of the corporation. The section then provides that no transaction between a corporation and a director "shall be void or voidable" under certain circumstances merely by reason of the fact that such director is present at the meeting of the board which approves such transaction or by reason of the fact that his vote is counted for such purpose. This last-mentioned portion of said section can have no application here as no directors' meetings were held with respect to the above-mentioned transactions. It may be further noted that said section does not purport to set forth all of the various circumstances which may render valid a transaction between a corporation and one of its directors. As is said in Ballantine's California Corporation Laws, 1938 Edition, section 92, at page 99, "This section does not undertake to codify all of the rules of law and equity with reference to dealings between directors or officers and the corporation."

Numerous authorities are cited in 6A California Jurisprudence at page 1112 in support of the proposition that "In accord with the general fiduciary duties and relationship which a director bears, an officer is not precluded from dealing directly with the corporation of which he is a director, although any transaction between them is subject to rigid scrutiny and is voidable for any violation of his duty as trustee, but is not absolutely void." And it has been further held that where the consenting directors are the only stockholders and the only beneficiaries of the trust, a sale to the corporation by its directors of their own property at their own price is neither void nor voidable at the instance of the corporation. (See *Sargent* v. *Palace Cafe Co.*, 175 Cal. 737, 739 [167 Pac. 146], and authorities cited; 6A Cal. Jur. 1121.) It thus appears that there are circumstances under which a director may deal with the corporation and that there are circumstances under which such a transaction will be neither void nor voidable at the instance of the corporation. In passing, we may state that there is neither allegation nor

proof in the present case that at the time that the transactions in question took place, there were any creditors or that any act was done by the corporation or any individual in fraud of creditors. We must therefore treat the stockholders in the present case as the "only beneficiaries of the trust" and, under the findings, all that was done by defendant was done after full disclosure and with the full knowledge and consent of all said beneficiaries.

■ It is immaterial that no formal directors' meetings were held. While it is true that a corporation ordinarily acts by resolutions which are adopted at formal meetings of its board of directors and are entered in its minutes, it is also true that decisions reached by all the directors and stockholders of a closed corporation at informal conferences will be binding upon the corporation when, by custom and with the consent of all concerned, corporate formalities have been dispensed with and the corporate affairs have been carried on through such informal conferences. (*First National Bank* v. *Frazier*, 143 Ore. 662 [19 Pac. (2d) 1091, 22 Pac. (2d) 325]; *National Bank* v. *Puget Sound Biscuit Co.*, 61 Wash. 192 [112 Pac. 265]; *Longmont Supply Ditch Co.* v. *Coffman*, 11 Colo. 551 [19 Pac. 508]; *Miller* v. *South Hills Lumber & Supply Co.*, 334 Pa. 293 [6 Atl. (2d) 92]; *Baker* v. *Smith*, 41 R. I. 17 [102 Atl. 721]; Fletcher's Cyclopedia of Law of Private Corporations, vol. 2, sec. 394; Thompson on Corporations, 3rd Ed., vol. 2, sec. 1171.) Such was the case here.

For the foregoing reasons, we conclude that under the facts as found by the trial court the transactions complained of were valid against attack by the corporation or the trustee in bankruptcy of said corporation.

The judgment is affirmed.

Gibson, C. J., Shenk, J., Curtis, J., Edmonds, J., Carter, J., and Traynor, J., concurred.