[L. A. No. 20674. In Bank. June 3, 1949.]

FRANK JEPPI et al., Appellants, v. BROCKMAN HOLD-
ING COMPANY, INC. (a Corporation) et al.,
Respondents.

Calvin H. Conron, Jr., Mack & Bianco and D. Bianco for Appellants.

Stead & Boileau and Charles R. Stead for Respondents.

EDMONDS, J.—Frank Jeppi and W. B. Camp, Sr., are suing for damages assertedly sustained by them because of the refusal of Brockman Holding Company, Incorporated, and Mary C. Spalding, its president, to convey certain real property. A decision of the appeal from the judgment which followed an order granting a nonsuit turns upon the authority of Mrs. Spalding to bind the corporation.

The evidence presented by the appellants, stated most favorably to them may be summarized as follows: Brockman Holding Company, Incorporated, was organized in 1930 to manage and dispose of the estate of I. W. Brockman, deceased. The corporation's principal place of business was at Pomona, where most of the directors lived. Mrs. Spalding was a resident of Santa Cruz. It was the custom to hold only one directors' meeting each year; during the interim matters were handled informally by the directors.

At the annual meeting held on May 1, 1944, the following resolution was adopted: "Motion was made by Bert Harvey, seconded by Spalding, that the property of Brockman Holding Company be sold in order to close up the company as soon as possible." In May of the following year, at the conclusion of the stockholders' meeting, a majority of the directors, who controlled 29,000 shares of the 42,000 shares outstanding, held a meeting and, among other matters considered, informally discussed the sale of the land which is the subject of the present controversy.

This property, acreage in Kern County and a lot in Los Angeles County, constituted substantially all of the remaining assets of the corporation. The minutes of the board meeting make no reference to the informal discussion. However, according to the testimony it was agreed that Mrs. Spalding should go to Bakersfield and negotiate a sale of the acreage. The evidence includes a letter from L. W. Young, dated in December, 1944, offering $25,000 for the Kern County land. There was testimony as to a prior offer obtained by H. I. Tupman, who managed the corporation's property in Kern County, and Mrs. Spalding was instructed to contact him for the purpose of ascertaining whether the offer was still open.

Three weeks after this meeting, Mrs. Spalding, Tupman and Jeppi visited the property and Jeppi made an offer of $27,500 for it. Mrs. Spalding said: "It suits me all right, and I will get in touch with my people in Pomona by phone and let you know." Jeppi replied: "All right, if your directors decide to sell . . . I will meet you at the abstract office. . . ." The next day at the office of a title company, an escrow agreement was signed by Mrs. Spalding, as the president of the corporation, and Jeppi, and he deposited his check for $27,500 in escrow. By the terms of this agreement, title was to be conveyed to Jeppi and W. B. Camp, Sr.

On the same day, the title company sent a letter to the corporation requesting that it forward deeds as called for by the escrow agreement concerning the sale of the land. A week later, the following telegram was received in reply: "Brockman Holding Company sale not approved by directors and better offer has been received. Directors meeting to consider all proposals will be held June 14th." Jeppi was advised that the corporation had received an offer of $30,000 for the property. Through his counsel, Jeppi gave notice that he intended to stand upon the agreement as stated in the escrow instruction but, to avoid a lawsuit, he would offer $30,100. On June 14th, Jeppi was notified that the property had been sold for $32,025, and the following day he withdrew his deposit from the title company.

At the conclusion of the appellants' presentation of this evidence, the court granted a motion for a nonsuit made on the grounds that there was no proof of a contract by Mrs. Spalding or by any authorized officer of the corporation. The appeal is from the judgment which followed that order.

Whether the ruling upon the motion was correct primarily depends upon the narrow question as to the authority of Mrs. Spalding to execute the escrow instructions on behalf of the corporation. The appellants assert that the evidence shows such authority. She and the corporation take the position that (1) there was no evidence of any actual or implied authority to enter into a contract of sale; (2) as the escrow instructions included substantially all of the assets of the corporation, the approval of a majority of the stockholders was required; (3) the "equal dignity rule" requires that Mrs. Spalding's authority be in writing; (4) the record shows actual notice to Jeppi of her lack of authority; and (5) the appellants themselves canceled the alleged contract.

 From the evidence in regard to the informal nature of the corporation's conduct of business, the general declaration of policy made by the directors in 1944 to sell the remaining property, the informal discussion immediately prior to Mrs. Spalding's trip to Kern County, and her execution of the escrow agreement after a delay in the negotiations for the express purpose of getting approval from her "people," it reasonably may be inferred that the board of directors had authorized her to enter into the contract and to bind the corporation. It is not material that the authorization was given at an informal meeting of the directors of which no minutes were kept. (*Brainard* v. *De La Montanya*, 18 Cal.2d 502, 511 [116 P.2d 66].)

The corporation relies upon section 343 of the Civil Code (now Corp. Code, § 3901) which reads: "No corporation shall sell . . . all or substantially all of its property and assets . . . unless under authority of a resolution of its board of directors and with the approval of the principal terms of the transaction and the nature and amount of the consideration by vote or written consent of [the] shareholders. . . ." The appellants take the position (1) that the question as to the applicability of this statute was not presented for the purposes of nonsuit by the pleadings or the evidence; (2) that the section is not applicable to a wasting assets corporation; and (3) that, in any event, the corporation is not a party who may assert the invalidity of a sale made contrary to the requirement.

 The testimony of the escrow agent who handled the matter showed that the transaction concerned a sale of the sole remaining assets of the corporation. As to the second point, the California courts have not been called upon to determine the question of whether the statute in question applies to a wasting assets corporation, but authority from other jurisdictions places no restriction upon sales made in the ordinary course of business. "It is the rule at Common Law . . . that the directors of an ordinary business corporation have no power to dispose of all of its assets without the consent of all of the stockholders. This rule has been modified . . . by Statute, so that the corporation may dispose of all its assets and wind up its business when authorized by a majority vote of the outstanding stock . . . The reason for this limitation is that a corporation is organized for the purpose of doing business of some nature, and, if so, its share-

holders have the right to insist that the corporation continue for the purpose for which it was organized. A sale therefore, of all its property, or so much thereof as would prevent it from continuing in such business, would constitute a violation of the corporate contract. To this rule there are . . . exceptions. . . . If the conversion of all assets into cash . . . is in furtherance of the business for which the corporation was organized, the transaction is not *ultra vires*. For instance, if a corporation is organized for the purpose of buying, selling and dealing in real estate, it would naturally have the power to sell all the real estate it owned at a particular time because that is the very object of its organization. The sale of its tangible assets under such circumstances furthers rather than hinders the carrying out of its contract with its stockholders. . . ." (*Thayer* v. *Valley Bank,* 35 Ariz. 238 [276 P. 526].)

The provisions of the statute should not be applied solely upon the basis of the quantity of the property; the test which determines the question of the necessity for consent of the stockholders is, "whether the sale is in the regular course of the business of the corporation and in furtherance of the express objects of its existence, or something outside the normal and regular course of the business . . . Applying this test to the case at bar, we find the sale of the property in order to carry out the liquidation and distribution of the assets to the stockholders, was the explicit purpose, indeed the only purpose, for the organization of the corporation and manifestly was a sale in the regular course of its business. That was the very object for which the corporation was formed and for which it existed." (*In re Miglietta,* 287 N.Y. 246 [39 N.E.2d 224, 228].)

█ The undisputed evidence in the present case is that the Brockman Holding Company was organized for the sole purpose of managing and disposing of the property of a decedent's estate. Further, at the 1944 meeting of the stockholders a motion was made that the remaining assets should be sold "in order to close up the company as soon as possible." The contract of sale, therefore, was made in the normal course of business and cannot be held subject to the restrictive provisions of former section 343 of the Civil Code.

█ Section 2309 of the Civil Code reads: "An oral authorization is sufficient for any purpose, except that an authority to enter into a contract required by law to be in writ-

ing can only be given by an instrument in writing." The language of the California decisions does not make entirely clear whether this statute, the so-called "equal dignity rule," is applicable to the acts of a corporation's executive officer. In *Carrier* v. *Piggly Wiggly of San Francisco,* 11 Cal.App.2d 180, 182 [53 P.2d 400], the plaintiff was allowed to recover upon a contract, the court stating: "Corporations can act only through the agency of natural persons, and it has been held that the authority of an agent of a corporation need not be in writing, so far as the statute of frauds is concerned. *McCartney* v. *Clover Valley Land & Stock Co.,* (8 Cir.) 232 F. 697 [146 C.C.A. 623], citing *Boggs* v. *Lakeport Agricultural Ass'n.,* 111 Cal. 354 [43 P. 1106]." Yet in *Corporation of America* v. *Harris,* 5 Cal.App.2d 452, 459 [43 P.2d 307], after discussion of the cases, the court concluded: "The weight of authority, we believe, supports the view that the agent of a corporation, whether he be an executive officer or not, may not, merely because of his office, bind his principal upon a lease of real property for longer than a year, unless he has written authority from his principal so to do."

In discussing this conflict, the Court of Appeals of the Ninth Circuit said: "It should also be noted that *McCartney* v. *Clover Valley Land & Stock Co., supra,* cited and relied on in the Piggly Wiggly Case, expressly limits the exception, there stated, to the executive officers of a corporation. And *Boggs* v. *Lakeport Agricultural Ass'n., supra,* cited in the McCartney Case, is a case dealing with the authority of the 'president' of a corporation. It does not expressly appear from the facts stated in the Piggly Wiggly Case what position in the defendant corporation was held by the agent there involved, but it is a fair assumption from the facts that he was an executive officer. In the case of an executive officer of a corporation an exception from the requirement of written authority finds at least plausible support in reason in that, as said in the McCartney Case: 'The executive officer of a corporation is something more than an agent. He is the representative of the corporation itself.' " (*E. K. Wood Lumber Co.* v. *Moore Mill & Lumber Co.,* 97 F.2d 402, 408; see also, note, 1 A.L.R. 1132; 17 Cal.L.Rev. 70.) This reasoning squares with sound principles and the necessities of modern business.

The language in *Corporation of America* v. *Harris, supra,* which does not recognize any exception to the rule, is, at most, dictum. The "crucial point" of the decision was not the

extent of the agent's authority but, as the court stated it, whether the defendant "under all the facts and circumstances of the transaction, is in a position to avail itself of the statute of frauds as an avenue of escape from liability," there being grounds of estoppel present. So limited, the opinion is not authority for the position taken by the respondents in the present litigation, and the decision, insofar as it concerns the application of the statute to the act of an executive officer of a corporation, is disapproved.

Considering a further contention of the respondents, by stating testimony obtained from Mrs. Spalding under section 2055 of the Code of Civil Procedure and that of Jeppi, with inferences most favorable to the corporation, they endeavor to show knowledge by Jeppi of Mrs. Spalding's lack of authority. But upon appeal from a judgment of nonsuit, it is the duty of this court to consider the evidence and the inferences which reasonably may be drawn from it in the light most favorable to the plaintiff. That other evidence may be found in the record which would support equally reasonable inferences to the contrary is of no consequence.

Finally, the respondents argue that the "appellants having themselves cancelled the contract cannot seek relief pursuant thereto." They rely in this connection on Jeppi's withdrawal of his deposit and the title company's action in marking the escrow instructions "cancelled." But all of this occurred a week after the respondent corporation, by its telegram to the title company, repudiated the contract and notified Jeppi of the sale of the property to Young. Such acts clearly amounted to an anticipatory breach of the contract, giving the appellants a cause of action and avoiding the necessity of continuing to tender performance of their obligation under the contract. (*Atkinson* v. *District Bond Co.*, 5 Cal. App.2d 738 [43 P.2d 867]; 6 Cal.Jur. § 274, p. 460; 5 Williston on Contracts, § 1302, p. 3700.)

The evidence of the appellants, with inferences which reasonably may be drawn therefrom, would amply support a finding that Mrs. Spalding was authorized to enter into the escrow agreement. Having that authority, she could of course bind the respondent corporation by her execution of the escrow agreement. Its motion for a nonsuit, therefore, should have been denied, and the same ruling made upon the motion by Mrs. Spalding. Although one is not liable personally on a contract executed by him as the officer of a cor-

poration, he may, if he acted without authority, be held to account on a theory of breach of the implied warranty of authority (Civ. Code, § 2342), or, if bad faith is found, as a principal (Civ. Code, § 2343). The extent of Mrs. Spalding's liability, if any, depends upon the determination of questions of fact which cannot be made until the issue of her authority to act for the corporation is decided.

The judgment is reversed.

Gibson, C. J., Carter, J., and Spence, J., concurred.

SHENK, J., Dissenting.—The judgment is reversed principally on the ground that the agreement to sell was merely an agreement to sell property in the ordinary course of business by a corporation whose only function was to sell the assets of the Brockman estate. There is thus projected an exception to the rule established by section 3901 of the Corporations Code which requires that a transfer of all corporate assets be authorized by resolution of the board and by written consent of shareholders.

It is undisputed that the purported agreement was intended to convey substantially all of the assets of the corporation. The statute makes no fine distinction between transfers of all the assets in the ordinary course of business and other transfers of the entire assets. On its face the statute would apply without exception wherever all assets are transferred. This was not an ordinary sale. It was an attempted complete disposal of the corporate property and required to be properly authorized. The evidence on which the opinion relies as showing that this was not a wind-up sale proves the opposite. On May 1, 1944, a resolution was adopted that "the property of Brockman Holding Company be sold in order to close up the company as soon as possible." Just a year later plaintiff and defendant's president entered into an agreement whereby all of the property of the corporation was to be transferred to the plaintiff.

The aim of the statute is "to give some protection to the shareholders by affording them a chance to have a vote in making a transfer." (Ballantine and Sterling, California Corporations Laws, [1949] 398.) More pointedly, the purpose of the statute is to prevent directors or officers from selling the corporation out from underneath the shareholders if they object to the terms of sale. Here the directors owned

29,000 of the 42,000 shares. All of the directors did not authorize Mrs. Spalding to sell the remaining property of the corporation. Only a majority of the directors, who for all that appears constituted less than a majority in stock ownership, orally sanctioned the sale. I am unable to conclude that this was not a case where the statutory protection was appropriate.

I would affirm the judgment in accordance with the opinion of the District Court of Appeal of the Fourth District (191 P.2d 534).

Traynor, J., and Schauer, J., concurred.