[Civ. No. 18852.   Second Dist., Div. Two.   Apr. 8, 1952.]

WILLARD HERRING, Respondent, v. FLOYD C. FISHER et al., Appellants.

Tudor Gairdner for Appellants.

Walter E. Egerman and Morris L. Marcus for Respondent.

MOORE, P. J.,—Respondent was awarded judgment against appellants on eight counts for eight commissions for sales

of real properties. The findings recite that the sales were made pursuant to respondent's employment by appellants. The grounds for appeal are that (1) the evidence does not support the findings that appellants by writing authorized respondent to sell the properties; (2) the purported authorizations lack sufficient descriptions of the properties; (3) there is no evidence to support the finding that the corporation was the *alter ego* of Fisher and that the two appellants owned the properties; (4) the offers of three alleged buyers expired by their own terms; (5) there is no proof to support the finding that each purchaser signed a written agreement to buy the property allegedly sold to him; (6) the judgment grants commissions upon successive sales of the same property.

## DID APPELLANTS' WRITING AUTHORIZE RESPONDENT TO MAKE SALES?

Fisher and his wife owned respectively 53 and 47 per cent of the capital stock of Elfleda Properties, Inc., incorporated in 1943, herein referred to as the corporation. The titles of the several properties were vested in the corporation which had acquired them for rental purposes. Having sold twelve other properties for appellants, respondent sought purchasers for the four apartment houses on Alameda Street in Burbank. They were numbered 1307, 1317, 1511 and 1515.

Four writings are relied upon as supplying the proof required by the statute of frauds ([1]Civ. Code, § 1624). While none of the four memoranda designates a property by legal description, or a commission by percentage or a specified brokerage, all of them construed together may be a compliance with the last cited statute. Of this, more later. While the court found that the alleged vendees named in the first six counts (Ridgeway, Schliesser, Talcott, Tussing, and Wright) severally signed written agreements to purchase, such signed contracts do not appear in the record. Although it found that each of the alleged purchasers was ready, willing and able to buy, with the exception of Ridgeway the record is destitute of evidence to support such finding. Respondent's testimony that they were able is a conclusion and is not proof of financial responsibility.

In presenting the memoranda written by Fisher, the emphasis is supplied. His first letter to respondent was writ-

---

[1]Civil Code, section 1624. "The following contracts are invalid, unless the same, or some note or memorandum thereof, is in writing and subscribed by the party to be charged or by his agent . . . 5. An agreement authorizing or employing an agent or broker to purchase or sell real estate for compensation or a commission . . ."

ten in late April, 1946, refers to the terms for the sale of a house "North of Kitridge," to a "deal on Victory Blvd," and to a split commission, "or would you rather take your folks on Alemeda." He closes with the following: "I would prefer if *you consentrated your efforts on Alemeda & Screenland Dr. & let the two English Bldgs stay until last—that is unless you get something very attractive* as I mentioned in the early part of the letter. *You are welcome to put a sign up on Alemeda & Screenland for your own benefit if you so desire.* But they must buy them as is. If there are odds & ends to be done they can afford to get them fixed. Write when you have time.

Floyd Fisher"

The second writing signed "Floyd" (Ex. 14) written May 18, 1946, after referring to a deal on "Victory Blvd" concludes with *"Don't quote those on Alemeda less than 20,500 —4500 dn. min.* Your Adds are definitely very good after reading them I feel as tho I'd like to buy a couple myself."

The third communication signed "Floyd" (Ex. 6) was written on May 20, 1946, Fisher there says: *"Get more dough on the last one* on Alemeda—They are quite nice inside and only one year old—they cost me considerably more . . . *I want to average 19,500 net to me on all bldgs so get more where you can."*

On August 10, 1946, "Floyd" wrote respondent (Ex. 4) rejecting alleged offers: Talcott, 20,500 for 1515-17 Alameda; Ridgeway, 20,500 for 1311-13, Alameda; Schultz, 20,500 for 1307-09 Alameda; Tussing, 21,500 for 1511-13 Alameda; Wright, $21,500 for 1317-21 Alameda. He did not forward it until August 21, 1946, when he added the following postscript: *"Here is the lineup for the moment,* subject to change if there is any delay.

> Talcott—no deal
> *Ridgeway   20,000 net*
> Schultz   20,000 net if title is not clouded
> Tussing   21,000 net
> Wright   21,000 net
> $4000 dn. payment required
> $500 due in 1 yr.
> $40 per mo (no more) 6% int.
> Hope this cleans up the situation."

In addition to the foregoing, writings were introduced which relate to the other alleged sales but contain nothing

of a substantial nature as proof of respondent's employment. To prove the several counts, deposit receipts were filed in evidence as follows:

| | | | |
|---|---|---|---|
| Count I | Ridgeway | dated June 21, 1946; |
| Counts IV & V | Tussing | " July 17, 1946; |
| Count VI | Wright | " July 14, 1946; |
| Count VII | Schultz | " July 14, 1946; |
| Count VIII | Grossman | " April 29, 1946; |
| Count III | Talcott | " April 24, 1946. |

Also, in proof of Count VIII, an unsigned carbon copy of escrow instructions was received in evidence along with an unsigned note dated May 11, 1946, for $5,075, an unsigned deed of trust containing a copy of the same note and "additional escrow instructions," also unsigned.

Whereas the combined effect of the writings may justify a finding of employment of appellant to make a sale, it is significant that not a word is to be found in all the writings to deprive Fisher or the corporation of the right to reject any sale made by Herring. That privilege he exercised by a writing on August 10. In the same letter he fixed the prices and specified the terms of sales of the several parcels. For respondent to earn a commission for the sale of any of those properties, it was essential that a buyer execute a purchase contract on terms substantially as required by appellants and be ready to consummate the purchase and be able to pay the price exacted. ■ The mere act of an owner in naming a price in writing to a broker at which he is willing to sell his real property does not constitute an employment of the broker or bind him to pay a commission. (*Herzog* v. *Blatt*, 80 Cal.App.2d 340, 342 [180 P.2d 30]; *Patterson* v. *Torrey*, 18 Cal.App. 346, 348 [123 P. 224].) ■ The memorandum of the owner must show an authority to negotiate on behalf of the owner. (*Morrill* v. *Barneson*, 30 Cal.App.2d 598, 602 [86 P.2d 924].) ■ And to bind the owner to pay a commission on the broker's demand the latter must have sold the property on the precise terms and within the period of his agency. (*Jauman* v. *McCusick*, 166 Cal. 517, 521 [137 P. 254].) While no term of respondent's employment is specified, the several writings sufficiently imply an authority to negotiate sales. However, even though the broker was authorized to negotiate before a commission would be earned, it was necessary for appellants to confirm the sale by accepting the services of the broker in effecting the deal.

The evidence received does not fulfill the requirements of

the foregoing rule as to Counts II to VIII inclusive. Not one of those alleged purchasers put any money in escrow. Not one of them was proved to have any money or a source from which to obtain the funds required to complete the purchase. ■ That they may have been ready and willing to buy is not enough. There must have been ability to pay and the burden is on the broker to show the financial ability of his vendees. (*Phelan* v. *Hilda Gravel Min. Co.*, 203 Cal. 264, 268 [263 P. 520, 56 A.L.R. 476].) Schliesser signed no ''deposit receipt.'' While Talcott, Tussing and Wright presumably signed the deposit receipts bearing their names as signers, there is no actual proof that any of them was able to buy. In none of the basic writings is there a promise by appellants to pay anything at any time. If by inference a promise of reward for effort be derived, it cannot be said that such promise comprehended payment of a commission prior to the broker's achievement of a sale. Certainly there is no promise to pay a commission before a sale is consummated on the terms prescribed by appellants. Moreover, neither in Exhibits 4, 6, 7, 14 nor in any other writing did appellants promise to pay anything for mere effort. Schliesser (Count II) became ''sick and tired of the whole mess and the only way they will do the deal is the original way—$6000 down.'' Talcott's offer was rejected and there is no proof that Wright ever even offered to purchase. As to Tussing, respondent could not learn (Ex. 18)[2] how Fisher

[2] ''WILLARD HERRING
3905 W Victory
Burbank Calif

CH 8-3455

August 20th '46

Dear Floyd Fisher:
Haven't heard from you up to todays mail concerning those deals, A couple of those guys expect to evict for occupancy and they are getting mad at me.
I have Mr. Lyle Tussing's house for sale, 3 bedrooms, and have made it $3500. down in accordance with your latest deal,—He expected one in the 1500 Block at $21,500. having purchased it (like all the rest) during the period the OPA was off. We thought he could serve a 30 day notice on a tennant, I would sell his house and give occupancy. But now that the OPA is off, I brought him to the corner one of Griffith Park Dr. & Alameda—1317-21. He will purchase that at the same price with the occupancy. Wagner has now moved out entirely and I have the keys to the Apartment. They left it pretty clean.
Now the question is, if you are going to change your mind about the down payment on it, I'll have to change the deal on his house, perhaps to a G.I. deal as buyers don't have too much down anymore. However, I must know how you want that deal handled. Evidently

wanted the deal handled "as you [Fisher] wont comment one way or other."

### RIDGEWAY SALE—COUNT I

The foregoing discussion leaves no doubt that the writings signed by Fisher were clearly intended to authorize respondent to make sales of the four properties. They are sufficient to comply with the statute of frauds, *supra,* requiring some note or memorandum setting forth the terms of employment of a person to sell realty to be in writing, signed by the owner. ■ When that requirement has been met with reference to a definite parcel, the agreement to pay a commission and its amount may be shown by parol. (*Caminetti* v. *National Guar. Life Co.,* 56 Cal.App.2d 92, 95 [132 P.2d 318] ; *Moore* v. *Borgfeldt,* 96 Cal.App. 306, 311 [273 P. 1114].)

Therefore, appellants' failure to specify the amount of respondent's compensation for sales of the properties in any of the communications is no reason why under familiar principles, the trial court could not have derived a fair sum to be paid for the Ridgeway sale (Count I) since that was achieved by respondent after the buyer had been induced to complete the purchase of the property known as 1317 West Alameda. The sale was made substantially on the terms prescribed in Mr. Fisher's letter of August 10, 1946. Also, it must be inferred from the writings of Fisher that he purposed to pay respondent in case the latter should succeed in effecting a sale. No one could fairly determine that in April or May, 1946, he intended to take the benefits of respondent's advertising, entertaining prospects in his office, conducting them on tours of inspection and yet pay him nothing. The letters written by an operator who had on previous occasions employed appellant to sell properties could mean nothing less than an authorization to negotiate for the sale of the Alameda properties. ■ A formal written au-

---

you've been unhappy about the deals lately as you wont comment one way or other.

Will you please therefore, tell me how you want this handled, and PLEASE don't change your mind afterward, as I can't on this guy as I'm selling his house to get the dough.

Carmen is getting back in a week and I haven't had a vacation and I'd like to hear from you on these deals right away so I can clean them up one way or the other . . . I'd also like to get these deals cleaned up so I can start on something fresh. I'm sure you'll cooperate with me on this.

Best wishes,

BUD.''

thorization with all the terms agreed upon is not essential to warrant the finding of employment. (*Moore* v. *Borgfeldt, supra*, p. 311.) The letters quoted acknowledge respondent as appellant's agent to make sales of the apartment buildings. (*Needham* v. *Abbot Kinney Co.*, 217 Cal. 72, 75 [17 P.2d 109].) Despite such principle and the cited cases, other authorities are referred to as showing that there was no compliance with the statute of frauds. (*Marks* v. *Walter G. McCarty Corp.*, 33 Cal.2d 814 [205 P.2d 1025]; *Blanchard* v. *Pauley*, 92 Cal.App.2d 244 [206 P.2d 864]; *Herzog* v. *Blatt*, 80 Cal.App.2d 340 [180 P.2d 30]; *Morrill* v. *Barneson*, 30 Cal.App.2d 598 [86 P.2d 924]; *Irwin* v. *Klimper*, 56 Cal. App. 434 [205 P. 714]; *Kleinsorge & Heilbron* v. *Liness*, 17 Cal.App. 534 [120 P. 444].) A close scrutiny of those decisions discloses that the rights of the plaintiffs therein were in each instance governed by the rule that the naked act of an owner of real property giving a broker a writing containing the terms on which he will sell does not constitute an employment of the broker or entitle him to recover a commission for making a sale. (*Patterson* v. *Torrey*, 18 Cal.App. 346, 348 [123 P. 224].)

The letters of appellants in view of the past relationship of the parties can mean no less than a direction to respondent to arrange for the sale of the Alameda properties. Such writings were held to be a compliance with the statute of frauds in the case of *Toomy* v. *Dunphy*, 86 Cal. 639 [25 P. 130].

From appellant's previous payment of 5 per cent commissions to respondent on sales made in the vicinity of Burbank, it must be assumed that 5 per cent is a reasonable compensation for the sale of the apartment house for $22,000. Appellant attempts to make a point of the fact that 5 per cent would be $1100, whereas respondent demanded only $1000. Since the amount of the award is less than reasonable for the services rendered, no injustice was done by the discount. Where no amount of compensation is specified in the memorandum of employment, there is an implied promise to pay a *quantum meruit*. (*Kennedy* v. *Merickel*, 8 Cal.App. 378, 383 [97 P. 81].)

The same principle applies to the claim of the insufficiency of the description of the property sold to the Ridgeways. It had a number on a public street. The communications between Fisher and respondent leave no doubt that both parties knew the exact property intended. A contract

employing a realty broker is not void for uncertainty when such defect can be cured by pleadings and proof of extrinsic facts. (*Needham* v. *Abbot Kinney Co.*, 217 Cal. 72, 76 [17 P.2d 109].)

The contention that Fisher was not authorized to bind the corporation to sell its lands pales in the presence of the facts. The corporation was organized to deal in "properties." Fisher and his wife were owners of all its stock. Fisher was the unquestioned spokesman of the corporate entity if he was not indeed its *alter ego*. In his correspondence with respondent he never referred to the corporation.

The president did not require written authority to make sales or to employ an agent to do so. (*Jeppi* v. *Brockman Holding Co.*, 34 Cal.2d 11, 17 [206 P.2d 847].) The executive officer of such a corporation is more than an agent. He acts and speaks for the corporation in furthering its express objects and may sell all the properties of his corporation "because that is the very object of its organization." (*Ibid*, p. 16.) In the advancement of the corporate interests, a corporation can act only through its agents, and in its ordinary course of business its president as corporate representative may execute contracts to bind the corporation. (*Grummet* v. *Fresno Glazed Cement Pipe Co.*, 181 Cal. 509, 513 [185 P. 388].) Moreover, in view of the publicity given by respondent to his activity during the period of his attempting to sell the properties of the corporation at the behest of its president while the other officer remained quiet it must from such silence be assumed that the employment of respondent was approved by the corporation.

To deny respondent's compensation for effecting the sale to Ridgeway would operate as an injustice. He brought the property to Ridgeway's attention; exhibited it to him; received his written offer to buy accompanied by $500 as partial payment. Whereas by his communication of August 10, 1946, Fisher authorized respondent to sell the property for $20,000 net to Ridgeway, on August 29 he closed[3] a transaction directly with Ridgeway whereby appellants received $21,500 and on the same day Ridgeway "withdrew from the real estate deal, purchased on July 30, 1946." A broker has earned his commission when he has produced a purchaser ready, able and willing to purchase on the vendor's

[3]Respondent evidently made two sales to Ridgeway, June 21 and August 24, 1946. However, respondent's check refunding the payment bears date of August 24, 1946.

terms. (*Twogood* v. *Monnette*, 191 Cal. 103, 107 [215 P. 542].)

The judgment is reversed with instructions to enter a new judgment for plaintiff in the sum of $1,000, each side to pay its own costs on appeal.

Fox, J., concurred.

. McComb, J.—I dissent. See *Blanchard* v. *Pauley*, 92 Cal. App.2d 244, 247 [206 P.2d 864].